UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEVIN COLLINS<br><br>　　　　　Plaintiff,<br>vs.<br><br>COUNTY OF ALAMEDA, et al.<br><br>　　　　　Defendants. | Civil Action No.: 3:20-cv-05477 (EMC )<br><br>Joint Letter Brief Per Doc. 60 Order of Reference To Magistrate Judge for Discovery |

Defendants COUNTY OF ALAMEDA ("County") and ASHLEY CARVOLTH ("Carvolth") (collectively "County Defendants") and Plaintiff KEVIN COLLINS ("Plaintiff" or "Collins") respectfully submit this joint letter brief in advance of proceedings to resolve a discovery dispute that arose out of deposition questions posed to Deputy District Attorney Carvolth on March 10, 2022, regarding her assertion of various privileges as to her impressions and opinions of specific items in the case file compiled by the Oakland Police Department in relation to its investigation of a shooting. This matter requires prompt resolution since a similar issue will likely occur at the March 18, 2022, deposition of Terry Wiley, an attorney from the Alameda County District Attorney's Office, relating to the decision to file a criminal complaint against Plaintiff. **I. COUNTY DEFENDANTS' POSITION**

　　**A.　INTRODUCTION**

　　Plaintiff claims that his civil rights were violated as a result of his arrest and prosecution for assault with a deadly weapon (Penal Code § 245) and the attempted murder (Penal Code § 187) of Radajsha Briggs ("Briggs"). The interaction between Plaintiff and Briggs began on December 7, 2017, when Plaintiff is alleged to have assaulted and attempted to sodomize Briggs. According to Briggs, Collins returned shortly after the unsuccessful assault and shot her in the back. Approximately two years after his arrest, the charges against Collins were dismissed and Plaintiff was released from custody. Thereafter, Plaintiff filed suit against the County of Alameda, District Attorney O'Malley and Deputy District Attorney Carvolth claiming that they falsified information and evidence and advanced inappropriate legal arguments in an effort to obtain a conviction. Plaintiff alleges that the Oakland Police Department sought the legal advice of the District Attorney's Office prior to going forward with a second photo lineup that ultimately led to Collins being identified as the perpetrator. On December 20, 2017, Collins was arrested and criminally charged. As to Deputy District Attorney Carvolth, she was assigned on December 21, 2017, to handle the Preliminary Hearing and had no further involvement with the prosecution of the criminal case. On May 3, 2021, the Court granted Defendant County's Motion to Dismiss, dismissing some claims with prejudice and other claims without prejudice (Dkt. 45, 2:16-6:22; Dkt. 25, 20:21-21:17) Since Plaintiff did not file an amended complaint thereafter, in effect, all claims have been dismissed against County Defendants except "(t)he federal claims against Ms. Carvolth may proceed but the only factual predicate for those claims is her approval of the second photo lineup." (Dkt. 45, 7:2-5.) Similarly, District Attorney O'Malley had absolutely no involvement in this matter and was dismissed in response to Defendants' Motion to Dismiss. (Dkt. 45, 7:2-5, Dkt. 25, 20:21-21:17.) County Defendants dispute Plaintiff's claims and contend they are entitled to absolute immunity since the entirety of their involvement arose after Collins' arrest and out of the role as prosecutors in the District Attorney's Office. (Dkt. No. 25, 7:26-8:16) In

addition, as to any alleged actions by the District Attorney's Office prior to Collins' arrest, any County employees acted reasonably in light of the established law and are also entitled to qualified immunity (Dkt. 25, 8:17-13:16).

### B. PHOTO LINEUPS

The first photo lineup took place on December 11, 2017, a few days after the shooting when Briggs was shown six black & white photos. None of the County Defendants are alleged to have been involved with that lineup. Collins alleges that Officer Hight was provided improper guidance by DDA Carvolth before showing Briggs the second photo lineup on December 19, 2017. However, at his deposition, Officer Hight did not identify Carvolth as the person with whom he consulted with regarding the second photo lineup. In addition, no one at the DA's Office testified that they met with Officer Hight regarding this photo lineup. This photo lineup used six color photos each of which was edited so that only the heads/faces were shown with no background visible. SAC, Ex. 8 (second photo lineup). Collins' photo differed from the other photos in the lineup in that he was looking to the side instead of straightforward (as would be done with a mugshot).

• For the second photo, Briggs's written comment was: "I beleave [sic] this is the man who shot me. He has featurs [sic] not him or not sure."
• For the fourth photo (Collins), Briggs's written comment was: "I am almost sure this is the person I got in the car with and the same person came on 11 Ave[.] and shot me."
• For the fifth photo, Briggs's written comment was: "This man has strong featurs [sic] just like the man who shot me almost a lookalike."
• For the sixth photo, Briggs's written comment was: "He has eyes and lips like him." Briggs did not have written comments for the other photos. Importantly, this photo lineup was not unduly suggestive since Briggs identified 4 out of the 6 photos as the shooter or persons with features consistent with the shooter.

### C. COUNTY DEFENDANTS' RESPONSE TO REQUEST FOR PRODUCTION OF DOCUMENTS AND DEPOSITION EXAMINATION OF CARVOLTH

On March 8, 2022, County Defendants responded to the Plaintiff's Request for Production of Documents portion of the Notice of Deposition to Carvolth, producing all non-privileged documents from the case file provided by OPD Officer Hight to the DA's Office to assist with the decision regarding charging Collins with criminal violations and the prosecution of the criminal action (see Discovery Records attached hereto, listing all reports, video files, audio files et al. provided to Collins' defense attorney by DA's Office from its case file including exhibits covered in the subject deposition with the corresponding County Bate Stamp Nos. (e.g., Ex. 22, Officer Hight Case Notes (County 86-95); Ex. 31, Video Statement of Briggs on scene (County 41); Ex. 5, Video Statement of Briggs at hospital (County 41); Ex. 12, Photo Lineup #1 (County 129-135); Ex. 19, Photo Lineup #2 (County 136-142), Ex. 6, Written Statement of Briggs (County 116-117)) As part of their response, County Defendants' provided an Affidavit and Privilege Log as to privileged documents that were withheld from production at Carvolth's deposition on March 10th, asserting the attorney work product and deliberative process privileges and the official information privilege (California Evidence Code section 1040(b)(2)) (hereinafter "criminal prosecutor privileges"). In particular, the Privilege Log indicated that "(a)ttorney notes have been withheld

on the grounds of deliberative process & attorney work product privileges and official information privilege Evidence Code 1040." (Privilege Log, Item 8, 28 pages.) Despite asserting her criminal prosecutor privileges as to items from the case file which were provided by OPD to the DA Office, Plaintiff counsel insisted DDA Carvolth provide her impressions and opinions of items from the case file, including documents reviewed as part of her criminal prosecution of Collins, her impression of video files and audio files including words that she could hear, her impression of written statements or reports, and her opinions as to whether said items were exculpatory in nature. (see attached relevant pages of Carvolth deposition (pp. 57-61, 91, 95-96) for exemplars demonstrating the line of questions, objections, and Carvolth's testimony that she reviewed case file in relation to her prosecutorial duties) Since said impressions and opinions were subject to the criminal prosecutor privileges at the time she reviewed the file in 2018, her impressions and opinions of this evidence equally remain protected by said privileges during her recent deposition.

### D. LEGAL ANALYSIS AND CONCLUSION

The United States Supreme Court first recognized the attorney work product privilege in *Hickman v. Taylor*, 329 U.S. 496, 509-514 (1947). In this regard, the protection of the proper preparation of a case demands that an attorney assemble information, sift what she considers to be relevant from the irrelevant facts, prepare her legal theories and plan her strategy without undue and needless interference. Id. This work product is reflected in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways. Were such materials open on mere demand, much of what is now put down in writing would remain unwritten. Id. Thus, an attorney's thoughts are inviolate. Id.  Subsequently, the attorney work product privilege was codified in federal and state law. See Federal Rule of Civil Procedure 26(b)(3), California Civil Code of Procedure section 2018.030 ("writing that reflects an attorney's impressions, conclusions, opinions, or legal research or theories is not discoverable under any circumstances") [see also *Dept. of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1 (2001) (work product privilege protects mental processes of attorney while deliberative process privilege covers documents reflecting advisory opinion and deliberations comprising part of process by which governmental decisions and policies are formulated).]  Accordingly, County Defendants respectfully request that Carvolth's assertion of criminal prosecutor privileges be upheld at her deposition. In so ruling, Plaintiff will not be unduly prejudiced, since he can obtain the testimony he seeks through the deposition of experts or other witnesses not related to the criminal prosecution by the DA's Office. However, to rule otherwise would lead to inefficiency, unfairness and sharp practices in the giving of legal advice and in the preparation of cases at the DA's Office regarding the decision to charge a criminal case and criminally prosecute the matter through the Preliminary Hearing phase and at trial.

**Very truly yours**,
**ORBACH HUFF & HENDERSON LLP**
/s/
Randolph S. Hom

**Plaintiff's Position:**
### I. Legal Standard

Pretrial discovery is "accorded a broad and liberal treatment." *Hickman v. Taylor*, 329 U.S. 495, 507 (1947). "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case… Information within this scope of discovery need not be admissible in evidence to be discoverable." Fed. R. Civ. P. 26(b)(1). This broad right of discovery serves the integrity and fairness of the judicial process by promoting the search for the truth. *Shoen v. Shoen*, 5 F.3d 1289, 1292 (9th Cir. 1993).

### II. Privileges Asserted During Oral Deposition of DDA Carvolth

In an oral deposition, a person may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation ordered by the court, or to present a motion under Rule 30(d)(3). Fed. R. Civ. P. 30(c)(2). During the oral deposition of DDA Carvolth, the opposing counsel asserted deliberate process privilege, attorney work product privilege, and official information privilege. All of these privileges should not apply in this case.

#### a. Deliberative process privilege

The Freedom of Information Act exempts from disclosure inter-agency or intra- agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency. 5 U.S.C. § 552 (b)(5). The Supreme Court has interpreted this provision to protect only materials reflecting deliberative or policy-making processes, and not purely factual, investigative matters. *See EPA v. Mink*, 410 U.S. 73 (1973). Moreover, this exemption only applies to pre-decisional memoranda, because the disclosure of post-decisional memoranda does not impinge on the agency's deliberative process. *See Powell v. United States, Dep't of Justice*, 584 F. Supp. 1508, 1518-19 (N.D. Cal. 1984).

In this case, the deliberate process privilege does not apply because no "inter-agency or intra-agency memorandums or letters" were asked of the deponent during this deposition. Further, the deposition questions did not ask about deliberative or policy-making processes, but rather factual, investigative matters. For example, asking the witness whether she has seen a certain video before or whether she heard the person in the video say certain words is a question of fact and has little to do with agency policy-making. Moreover, the disclosure sought is post-decisional and does not impinge on the DA's office's deliberative process. The questions did not ask for the deponent's opinions on the videos when she might have watched them six years ago in preparation for the charging decision, but rather her present impression and understanding of what is happening in the videos.  Further, one of the key issues, in this case, is Defendant Hight's failure to include specific exculpatory evidence in his case notes.  In her deposition, Carvolth indicated she did not remember specifics

#### b. Work product privilege.

The work product privilege protects from discovery "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative." Fed. R. Civ. P. 26(b)(3)(A). It protects against disclosure of the "mental impressions, conclusions, opinions, or legal theories" of the party's attorney concerning the litigation. *Id.* at

26(b)(3)(B). The primary purpose of this privilege is to "prevent exploitation of a party's efforts in preparing for litigation." *Admiral Ins. v. U.S.D.C. (Ariz.)*, 881 F.2d 1486, 1494 (9th Cir. 1989). Work products can nonetheless be discovered if "the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Fed. R. Civ. P. 26(b)(3)(A)(ii).

In this case, the work product privilege does not apply. First of all, it does not matter whether the exhibits shown to the deponent DDA are her work product, because this is not a Rule 34 discovery where the plaintiff seeks access to documents. The plaintiff has already lawfully obtained access to the documents. This case is thus distinguished from similar cases where the criminal-defendant-turned-civil-case-plaintiff seeks prosecutorial or investigative documents and faces the work-product objection from the government. *See, e.g., Tennison v. City & County of San Francisco*, 226 F.R.D. 615 (N.D. Cal. 2005); *FTC v. Grolier, Inc.*, 462 U.S. 19 (1983).

The DDA's answers to the deposition questions are not work product, because they are not "documents and tangible things." Moreover, even if they involve her mental impressions, they are her impressions of the exhibits in a superficial manner, not her legal strategies concerning the litigation because there is no litigation. For her to answer these questions does not present an "exploitation" of her efforts in preparing for litigation; in contrast, allowing her to not answer would grant prosecutors unchecked liberty to evade any questions involving mental impressions, rendering depositions futile. Immunity from liability should not equate to immunity from discovery, which is to be liberal and broad according to the Federal Rules and the Supreme Court. " *Hickman v. Taylor*, 329 U.S. 495, 507 (1947)

Even if the DDA's answers are attorney work product, they should still be discoverable based on the plaintiff's substantive need and lack of alternatives. The plaintiff has a substantial need for the DDA's answers to prepare his case. For example, if the DDA answers that she has not seen the videos, and that had she known the information in the videos, she would not have proceeded with prosecuting this case, then it would reflect on Officer Hight's liability and credibility. The DDA's answers about these exhibits cannot be obtained by other means.

### c. Official Information Privilege

A public entity has a privilege to refuse to disclose official information "if disclosure of the information is against the public interest because there is a necessity for preserving the confidentiality of the information that outweighs the necessity for disclosure in the interest of justice." Cal. Evid. Code § 1040, subd. (b)(2). This conditional privilege only applies to "information acquired in confidence…in the course of his duty." *Id.* at subd. (a). The Ninth Circuit adopts a balancing test between the potential benefits and disadvantages when the disclosure of law enforcement files in a civil action is at issue. *See, e.g. Sanchez v. City of Santa Ana,* 936 F.2d 1027 (9th Cir. 1990); *Kelly v. City of San Jose,* 114 F.R.D. 653 (N.D. Cal. 1987).

In this case, the official information privilege does not apply because the information was not acquired in confidence in the course of the DDA's duty. The video of Ms. Briggs on the ground when 911 arrived, for example, was filmed by the police officer at the scene, in a public

setting. Many questions asked of the DDA seek information that has only been acquired during the deposition itself, such as the DDA's impression of the exhibits.

   Moreover, under a balancing test, the benefits of disclosure outweigh the disadvantages. Specifically, the DDA's answers would provide useful information that is not available to the plaintiff by other means, especially in a case already fraught with asymmetry of information and power. It also serves the public's interest by providing more transparency in a process that could easily be (and was indeed) abused, restoring the public's trust in the prosecution's fairness, and fulfilling the public's desire in seeing justice served. In contrast, the disadvantages of the disclosure are slight, since the information at issue was not so confidential in nature as, for example, notes on trial strategies, that providing it might cause a chilling effect on prosecutorial functions.

**Respectfully submitted,**
Law Offices of Bonner & Bonner

*//A. Cabral Bonner*