1
2
3
4                        UNITED STATES DISTRICT COURT
5                       NORTHERN DISTRICT OF CALIFORNIA
6
7    KEVIN COLLINS,                        Case No. 20-cv-05477-EMC
8                 Plaintiff,
                                           **ORDER GRANTING CITY**
9        v.                                **DEFENDANTS' MOTION FOR**
                                           **SUMMARY JUDGMENT AND**
10   COUNTY OF ALAMEDA, et al.,            **GRANTING IN PART AND**
                                           **DEFERRING IN PART DOOHER'S**
11               Defendants.               **MOTION FOR SUMMARY**
                                           **JUDGMENT**
12
13                                         Docket Nos. 82-83
14
15          Plaintiff Kevin Collins was arrested and imprisoned for the shooting of a prostitute,

16   Radajsha Briggs, on December 7, 2017.  Almost two years later, Mr. Collins was released and the

17   charges against him dismissed.  He was never tried for nor convicted of the crime.  Subsequently,

18   Mr. Collins filed suit.  He claimed a violation of rights under both federal and state law, including

19   but not limited to 42 U.S.C. § 1983.  Following various orders of the Court, the remaining

20   defendants are as follows: (1) the City Defendants (consisting of the City of Oakland, the Chief of

21   Police at the time, and several police officers) and (2) Melissa Dooher, a Deputy District Attorney

22   ("DDA") for Alameda County.[1]

23          Currently pending before the Court are (1) Ms. Dooher's motion for summary judgment

24   and (2) the City Defendants' motion for summary judgment.  Having considered the parties' briefs

25   and accompanying submissions, as well as the oral argument of counsel, the Court hereby

26

27   ───────────────────

28   [1] In his original complaint, Mr. Collins named a different DDA – Ashley Carvolth – but the Court
     recently allowed Mr. Collins to, in effect, substitute Ms. Dooher for Ms. Carvolth.  *See* Docket
     No. 79 (minutes).

United States District Court
Northern District of California

1 **GRANTS** in part and **DEFERS** in part both Ms. Dooher's motion and the City Defendants'

2 motion.

### I.      FACTUAL & PROCEDURAL BACKGROUND

A.      Summary Judgment Evidence

The evidence submitted by the parties in connection with the summary judgment motions

reflects as follows.

On December 7, 2017, at about 1:30 a.m., Ms. Briggs was shot while walking near the

intersection of 11th Avenue and International Boulevard in Oakland.  After being shot, she spoke

to her brother on the phone, who then called 911 and told the operator (based on what Ms. Briggs

was telling him) that the shooter was a person with dreads and a black hat driving a silver, four-

door Hyundai.  *See* Tran Decl., Ex. E (transcript of 911 call); Cabral Bonner Decl., Ex. 2 (audio of

911 call).  Ms. Briggs first spoke to the police (Officer Breznik) while she was still laying on the

sidewalk.  *See* Breznik Depo. at 21; *see also* Cabral Bonner Decl., Ex. 31 (video).

About half an hour later, Officer Breznik spoke with Ms. Briggs a second time – this time

at the hospital.  The purpose of the interview was to get a more detailed statement.  *See* Breznik

Depo. at 26; *see also* Cabral Bonner Decl., Ex. 5 (audio of interview).  As reflected in the written

statement that the police prepared and Ms. Briggs signed, Ms. Briggs stated that the shooter was

driving a silver, four-door Hyundai sedan and that the shooter was a black man with a medium

complexion and shoulder-length dreads and wearing a black hat.  *See* Tran Decl., Ex. B

(statement).  Ms. Briggs also stated that the shooter was "possibly" was a pimp named Jabree

Warren.  Tran Decl., Ex. B.  According to Ms. Briggs, she had been a witness in a case against

Mr. Warren in 2013, and, just two months earlier, Mr. Warren had threatened to kill her for being

a witness.  Ms. Briggs believed that the shooter could have been Mr. Warren because he has long

dreads.  *See* Tran Decl., Ex. B.  Ms. Briggs noted that she could not see the shooter's face.  *See*

Breznik Depo. at 31 (reviewing video footage of interview played by counsel for Mr. Collins;

agreeing that, during the video, Ms. Briggs indicated that she tried but did not see the shooter's

face).

At about 12:20 p.m. (*i.e.*, some ten hours later), Officer Hight – who had now been

United States District Court
Northern District of California

United States District Court
Northern District of California

assigned as the main investigator – went to the hospital to interview Ms. Briggs.  *See* Cabral Bonner Decl., Ex. 8 (audio of interview).  At the beginning of the interview, Ms. Briggs indicated that she was mistaken in thinking Mr. Warren could have been involved.[2]  *See* Tran Decl., Ex. D (Tr. at 5, 12).  Ms. Briggs now indicated that she believed the shooter was a john that she had had a "date" with shortly before the shooting.  The john had been driving a silver Hyundai.  He was an older Black man, about 42 years old and 5' 7" in height, and bald.[3]  *See* Tran Decl., Ex. D (Tr. at 7-8, 22).  When she first saw the john drive past, she could not see him because his head was covered with a hood and a hat.  When he drove by about 25 minutes later, he did not have the hood and hat on.  Ms. Briggs asked him his age and then told him that she had rules and regulations and would get out of the car if he did not follow them.  The john agreed; however, when she got in the car, he became "hood-like," which led Ms. Briggs to get out of the car.  Tran Decl., Ex. D (Tr. at 8-9).  Ms. Briggs then stated that, about fifteen minutes later, she was on the phone with her brother when she saw a silver Hyundai and she was shot.  *See* Tran Decl., Ex. D (Tr. at 10-11).  Ms. Briggs explained that she initially thought the shooter had dreads but it "was never dreads"; she mistakenly thought the shooter had dreads because he had a hood on underneath the hat.  Tran Decl., Ex. D (Tr. at 23).  Ms. Briggs also noted during the interview that the car the john was driving was "hella clean" and had a Lyft sticker in the front.  Tran Decl., Ex. D (Tr. at 31).

At some point during the interview, Officer Hight told Ms. Briggs that Mr. Warren was in custody at the time of the shooting (which implicitly meant he could not have been the shooter).[4]  *See* Hight Depo. at 396; *see also* Cabral Bonner Decl., Ex. 8 (audio of interview, at @10:29).

---

[2] During the preliminary hearing in the state court criminal case against Mr. Collins, Ms. Briggs claimed that she had wanted to tell the police earlier that she was mistaken; however, a nurse told her that she had to be taken to surgery first before she could speak with the police.  *See* Tran Decl., Ex. L (Tr. at 32-33).

[3] Although Ms. Briggs indicated that she did not see the shooter's face when he was driving and/or shot her, she did see the john she was with shortly before the shooting.

[4] In his opposition, Mr. Collins notes that "Ms. Briggs incorrectly told Officer Hight that with respect to [Mr.] Warren, she had informed Officer Breznik, 'that's what I told the officer, I said I went to jail three weeks ago, and some girl told me that Jabree was in jail.'"  Opp'n to City Defs.' Mot. at 3.

United States District Court
Northern District of California

1  During his deposition, Officer Hight acknowledged that there were inconsistencies in what Ms.

2  Briggs had told the police but stated that he did not know "if that was her being intentional or

3  deliberately inconsistent or if it was just an outcome of all the trauma that she was going through."

4  Hight Depo. at 74.

5      On December 9, 2017, *i.e.*, two days after the shooting, an unidentified person called 911

6  regarding the shooting.  She claimed to live across the street where the shooting took place and

7  indicated that she saw the shooting because she "saw the fire come from [the] car."  Tran Decl.,

8  Ex. E (911 call).  Apparently, she did not get the license plate number of the car at the time of the

9  shooting, but she later saw what she believed to be the same car shortly before she called.  She

10 identified the car as a silver Hyundai Elantra, perhaps a 2016 or 2017 model.  The person also

11 provided the license plate number for the car: 7MIM878.  *See* Tran Decl., Ex. E (911 call); Tran

12 Decl., Ex. J (Prob. Cause Aff. at 3).

13     The following morning, *i.e.*, December 10, 2017, another 911 call was made by an

14 unidentified person.  The person stated that "I called and reported the tag number" (providing the

15 same license plate number above) and that "[the] car [was] back out here last night again, on the

16 corner of 11th Avenue and . . . International."  Tran Decl., Ex. E (911 call); *see also* Tran Decl.,

17 Ex. J (Prob. Cause Aff. at 3).  Based on the text of the two 911 calls, it would appear that the same

18 person called twice.  For example, in the second call, the person stated, "I called and reported the

19 tag number," indicating that this was the second time the person was calling.  Also, in both calls,

20 the person stated that she could not pronounce the make of the Hyundai (*i.e.*, Elantra) and thus

21 spelled the word out.  During his deposition, Officer Hight admitted that it could have been the

22 same person making both calls but still claimed that "in all honesty the voice does sound

23 different."  Hight Depo. at 91.  According to Officer Hight, after the 911 calls, the police went out

24 to canvas the neighborhood "several times, but nobody was cooperating with us" and no one came

25 out to say that he or she had written down the license plate number of the car.  *See* Hight Depo. at

26 90; *see also* Hight Depo. at 99 (stating that attempts were made to track down the caller(s) before

27 and after Mr. Collins's arrest).

28     Several hours after the second 911 call, Officer Hight was told that a surveillance video

4

had been recovered that contained video of the shooting.

> A review of the video confirmed [the] Briggs statement that a 2016-2017, Hyundai, four door, silver sedan surveilled Briggs for approximately 10-15 minutes.  The same vehicle identified by a white sticker commonly identified as either a "Uber" or "Lyft" decal can be clearly seen in the lower left windshield of the suspect vehicle.  The same driver of the vehicle can also be seen, extending a black object out of the driver window and discharging what was later determined to be a handgun at and striking Briggs in the lower left back.

Tran Decl., Ex. J (Prob. Cause Aff. at 3); *see also* Cabral Bonner Decl., Exs. 9-10 (video footage).

In the early evening that same day (*i.e.*, December 10, 2017), Ms. Briggs called the police department and spoke to Officer Garcia.  During the call, she told Officer Garcia that "several people she knows to engage in prostitution activity along the International corridor called her" and told her that "a person matching the suspect description had been driving around the area in a silver Hyundai Elantra with CA license plate #7MIM878 asking other prostitutes if the girl that got shot 'dropped'" (*i.e.*, died).  Tran Decl., Ex. J (Prob. Cause Aff. at 3); *see also* Hight Decl. ¶¶ 4-9.  According to Officer Hight, after Ms. Briggs spoke to Officer Garcia, Officer Hight called her and spoke to her as well.  *See* Hight Depo. at 93 (testifying that "I believe it initially started from a phone call that Ms. Briggs had with another officer, and then I called her back concerning that conversation"); *see also* Cabral Bonner Decl., Ex. 28 (Tr. at 60-61) (testifying at the preliminary hearing that Ms. Briggs provided him with a license plate number).  The license plate number that Ms. Briggs gave to the police matched the license given by the unidentified 911 caller(s).  The police did a file check on the license plate number and found that it was registered under the Hertz Rental Agency and was rented out of Burlingame.  *See* Tran Decl., Ex. J (Prob. Cause Aff. at 4); *see also* Hight Decl. ¶¶ 4-9.

On December 11, 2017, Officer Hight contacted the manager of the relevant Hertz office.  The manager "confirmed that 7MIM878 is a rental out of his office under the 'Hertz Lyft Express Drive Program.'"  Tran Decl., Ex. J (Prob. Cause Aff. at 4); *see also* Hight Decl. ¶¶ 4-9.  This was notable since Ms. Briggs had previously told the police that the car the john had been driving was clean and had a Lyft sticker.  Officer Hight then contacted the Hertz Corporate Security office and asked for a copy of the rental agreement.  The agreement showed that the car was rented to Mr.

Collins.  *See* Tran Decl., Ex. J (Prob. Cause Aff. at 4); *see also* Hight Decl. ¶¶ 4-9.  The police did a criminal history check on Mr. Collins.  Initially, no criminal history was found but a further check through the Law Enforcement Analyst Portal showed that Mr. Collins was a suspect in a sexual assault from 2013.  *See* Tran Decl., Ex. J (Prob. Cause Aff. at 4); *see also* Hight Decl. ¶ 11. The police also conducted a check for firearms on the NCIC Automated Firearm System and found that Mr. Collins had three guns registered under his name.  *See* Tran Decl., Ex. J (Prob. Cause Aff. at 4); *see also* Hight Decl. ¶ 12.

Officer Hight then prepared a photo lineup.  Officer Hight used Mr. Collins's DMV photo in the lineup and used mugshots for the "fillers" in the lineup.  Each photo showed a Black man with little to no hair.  The fourth one was of Mr. Collins.  Because of the "highly identifiable and varying backgrounds" between Mr. Collins's photo and the mugshot photos, Officer Hight "opted to print the lineup in black and white."  Tran Decl., Ex. J (Prob. Cause Aff. at 4).

At about 3:20 p.m. on December 11, 2017, Officer Hight went to the hospital and showed Ms. Briggs a picture of the Hertz car that Mr. Collins had rented.  Ms. Briggs stated that it "looked exactly like the one the suspect was driving when he shot her."  Tran Decl., Ex. J (Prob. Cause Aff. at 4).  Officer Hight then had another officer – Officer Filice – show the photo lineup he had prepared to Ms. Briggs.  *See* Cabral Bonner Decl., Exs. 11 and 13 (first photo lineup and audio of lineup).  The lineup was double blind in that Officer Filice did not know anything about the investigation or who the suspect was.  The lineup was sequential in that Officer Filice showed Ms. Briggs the photos one at a time (*i.e.*, instead of all at the same time in a single array).  *See* Hight Depo. at 101; *see also* Cabral Bonner Decl., Ex. 76 (OPD Information Bulletin, dated 7/13/2022, regarding double blind sequential lineups); Cabral Bonner Decl., Ex. 77 (OPD Training Bulletin, dated 12/19/2021, regarding double blind sequential lineups).  As part of the lineup, instructions/admonishments were given to Ms. Briggs – *e.g.*, "The person who committed the crime may or may not be included," "Keep in mind that things like hair styles, beards, and mustaches can be easily changed and that complexion colors may look slightly different in photographs," "You should not feel you have to make an identification," and so forth.  Cabral Bonner Decl., Ex. 11 (first photo lineup).

1      After going through the lineup, Ms. Briggs filled out a statement regarding the lineup.  She

2   chose the person in the sixth photo as the shooter.  Under that person's photo, she wrote the word

3   "Yes."  Under the other five photos – including Mr. Collins's photo which was in the fourth

4   position – Ms. Briggs wrote "No."  In short, Ms. Briggs specifically stated that Mr. Collins was

5   not the assailant.  *See* Cabral Bonner Decl., Ex. 11.

6      According to Officer Hight, after the lineup was completed, he went to thank Ms. Briggs

7   for her time.  At that point, Ms. Briggs stated that she was not comfortable with her pick and

8   wanted to do a second lineup using photos in color.  *See* Hight Depo. at 119.  In his deposition,

9   Officer Hight indicated that, because he had photocopied the pictures, there was some noticeable

10   degradation in the quality of the photos.  *See* Hight Depo. at 398.  Although Ms. Briggs was now

11   expressing uncertainty about her pick, Officer Hight did not have Ms. Briggs go back and amend

12   her written statement.

13      Officer Hight maintains that, after getting this feedback from Ms. Briggs, he went to

14   consult with Ms. Dooher, a DDA who had a physical office in the Police Department, to get her

15   advice about the development of a second photo lineup.  *See* Hight Depo. at 16.  Officer Hight told

16   Ms. Dooher about the first photo lineup – and even handed her a copy of the photo lineup.  *See*

17   Hight Depo. at 16, 19.  He informed Ms. Dooher that Ms. Briggs had not picked Mr. Collins from

18   the lineup; that Ms. Briggs had in fact picked someone else (a "filler"); but that Ms. Briggs was

19   not comfortable with the lineup and asked to do a second one – in color (*i.e.*, because it was

20   difficult to see features in the black-and-white photos).  *See* Hight Depo. at 16, 19, 21, 123-24.

21   Ms. Dooher told Officer Hight that, if Ms. Briggs was not comfortable with her pick from the first

22   lineup, that would warrant a second lineup.  Ms. Dooher and Officer Hight also agreed that a wall-

23   off traffic stop could be used to get a better/color picture of Mr. Collins.  A wall-off stop is a legal

24   traffic stop (*i.e.*, one supported by reasonable suspicion or probable cause); however, the person

25   detained is not told during the stop that he or she is a suspect in a different investigation.  *See*

26   Hight Depo. at 22-24.  Officer Hight indicated that he thought a police officer's body-worn

27   camera could be used during the stop to get a picture of Mr. Collins.  *See* Hight Depo. at 24.

28   During her deposition, Ms. Dooher testified that she does not recall this conversation (or any other

1   conversation involving Mr. Collins and the lineups) taking place.

2       Officer Hight subsequently sent out an email so that the picture of Mr. Collins could be

3   obtained through the wall-off traffic stop.  In his email, he stated that "an officer generated

4   independent probable cause for a traffic stop" was needed for the investigation.  Hight Depo. at

5   24; *see also* Cabral Bonner Decl., Ex. 14 (Daily Police Bulletin ¶ 7) ("The actual susp veh appears

6   to be similar to a 2015 Hyundai Elantra.  Ofc. Hight is requesting F/C's on similar vehicles.

7   Please <u>develop independent PC for a stop</u> and forward the FC to <u>jhight@oaklandnet.com</u> or 510-

8   851-1039.") (emphasis in original); Cabral Bonner Decl., Ex. 56 (email from Officer Hight)

9   ("Please **<u>develop independent PC for a stop</u>** and forward the FC . . . .") (emphasis in original).

10      On December 12, 2017, the wall-off traffic stop of Mr. Collins was conducted.  *See* Cabral

11  Bonner Decl., Exs. 15-16 (videos); *see also* Cabral Bonner Decl., Ex. 70 (OPD Field Interview).

12  The stop was conducted by Officer Gatdula.  *See* Hight Depo. at 23; Gatdula Depo. at 31.

13  According to Officer Gatdula, Mr. Collins committed the traffic violation of failing to come to a

14  stop at the limit line at an intersection and/or failing to use his signal at the intersection.  *See*

15  Gatdula Depo. at 46, 49, 72.  After running a warrant check on Mr. Collins, Officer Gatdula

16  obtained Mr. Collins's photo by making up a story about needing an updated photo and then

17  taking his picture with a cell phone.  It took about 30 seconds for Officer Gatdula to tell this story

18  and take the picture.  *See* Gatdula Depo. at 86-89; *see also* Cabral Bonner Decl., Ex. 16 (video

19  from body-worn camera of Officer Gatdula).  Ultimately, Officer Gatdula did not cite Mr. Collins

20  but simply gave him a warning.  *See* Gatdula Depo. at 86-87.  It appears that the entire stop took

21  about two-and-a-half minutes.  *See* Cabral Bonner Decl., Exs. 15-16 (videos).  Officer Gatdula

22  emailed a copy of the picture he took to Officer Hight.  *See* Cabral Bonner Decl., Ex. 64 (email)

23  ("We conducted the ID stop on COLLINS, Kevin today.  I attached an updated photo I took

24  during the car stop.  His physical is still similar to what shows on DMV.").  In his deposition,

25  Officer Hight stated that he assumed the traffic stop had been legally carried out, particularly

26  because, in his email soliciting help to conduct the stop, he indicated that there needed to be

27  independent probable cause to support the stop.  *See* Hight Depo. at 23-24.

28      Officer Hight used the photo obtained from the stop as part of a second photo lineup.  *See*

Tran Decl., Ex. J (Prob. Cause Aff. at 4). According to Officer Hight, before the second photo lineup was shown to Ms. Briggs, he went back to Ms. Dooher (the DDA) and showed Ms. Dooher the photos he wanted to use for the photo lineup, including the picture of Mr. Collins that was taken from the traffic stop. This was to ensure that the lineup was not objectionable. *See* Hight Depo. at 21, 141. The photos in the lineup showed just the persons' heads – *i.e.*, everything else was photoshopped out. This was done pursuant to an earlier recommendation from Ms. Dooher that just the heads should be shown. *See* Hight Depo. at 141. It is not clear from the record whether Ms. Dooher ever saw the non-photoshopped picture of Mr. Collins, which showed that he had glasses on the top of his head. Similar to above, Ms. Dooher testified in her deposition that she did not recall this conversation having taken place.

About a week after the wall-off stop, the second photo lineup took place. It appears that, at some point before the second lineup, Officer Hight told Ms. Briggs that he had a suspect.[5] *See* Hight Depo. at 213 ("I told her that I had a – a suspect and in order to complete the second photo lineup, I – I needed her assistance."). As with the first lineup, the second photo lineup consisted of a double blind sequential lineup with instructions. Officer Ruiz conducted the second lineup. *See* Tran Decl., Ex. J (Prob. Cause Aff. at 4); Cabral Bonner Decl., Exs. 18-19 (second photo lineup and video of lineup). As indicated above, the second photo lineup used six color photos and was edited so that only the heads/faces were shown with no background visible. As with the first photo lineup, Mr. Collins appeared in the fourth photo. This time the photo of Mr. Collins was from the traffic stop. Mr. Collins's photo differed from the other photos in the lineup in that he was looking to the side instead of straightforward (as would be done with a mugshot). During the lineup, Ms. Briggs commented on the angle of the face in the photo, stating that she wished his

---

[5] In their reply brief, the City Defendants argue that Officer Hight "testified at least twice that he used the term 'person of interest' when he talked with Briggs about meeting for the second photo lineup," and "[o]nly after plaintiff's counsel used the term 'suspect' in his leading questions did [the officer] adopt that term later in his testimony." City Defs.' Reply at 6 n.1. Whether or not Officer Hight used the term "suspect," however, has little bearing in the case. *See, e.g.*, *Sanders v. Cullen*, 873 F.3d 778, 805 (9th Cir. 2017) (noting that, in a prior decision, the Ninth Circuit had "rejected the defendant's argument that a lineup was unnecessarily suggestive because the witnesses 'knew that suspects were in custody and they should make a pick'"; "defendant's 'fear that the lineups were impermissibly suggestive because witnesses knew that the suspects were in custody [was] misplaced' because 'it stands to reason that there is a suspect at the lineup stage'").

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

1 face had been "turned regular."  Docket No. 86-1 (Cabral Bonner Decl., Ex. 19) (video at @ 8:25-

2 8:42).

3         After going through the lineup, Ms. Briggs ultimately selected Mr. Collins as the shooter

4 (as reflected in a statement that she filled out regarding the lineup).  *See* Cabral Bonner Decl., Ex.

5 18 (second photo lineup).  Although she ended up choosing Mr. Collins, she made comments on a

6 total of four out of the six photos in the lineup.

7        • For the second photo, Ms. Briggs's written comment was: "I beleave [sic] this is

8             the man who shot me.  He has features [sic] not him or not sure."

9        • For the fourth photo (Mr. Collins), Ms. Briggs's written comment was: "I am

10             almost sure this is the person I got in the car with and the same person came on 11

11             Ave[.] and shot me."

12        • For the fifth photo, Ms. Briggs's written comment was: "This man has strong

13             features [sic] just like the man who shot me almost a lookalike."

14        • For the sixth photo, Ms. Briggs's written comment was: "He has eyes and lips like

15             him."

16         In his probable cause affidavit, Officer Hight described Ms. Briggs's identification of Mr.

17 Collins in the second photo lineup as follows:

18             Briggs became highly emotional i.e. crying, grabbing COLLINS
photo out of the array, covering her mouth and bending over at the
19             waist when reviewing his photograph.  Briggs stated that COLLINS
photograph (#4), was the suspect she remembered who shot her.
20             Briggs advised that photograph #2 was also a close semblance of the
suspect, however, Briggs reverted back to COLLINS photograph
21             and made an identification of COLLINS as the same person that
shot her and assaulted her for refusing to have anal sex with.

22

23 Tran Decl., Ex. J (Prob. Cause Aff. at 4).  A video was taken of Ms. Briggs during the second

24 photo lineup, but the video did not capture the entirety of the transaction, including when Ms.

25 Briggs ultimately selected Mr. Collins.  *See* Reply at 9 (admitting that the video "abruptly ends at

26 some point during the photo lineup and before Briggs made her selection of Plaintiff's photo" but

27 noting that, in his deposition, Officer Ruiz "testified he did not voluntarily turn off the camera . . .

28 and . . . was 'shocked'' to find out that the recording was not complete").  The video, however,

United States District Court
Northern District of California

does show that Officer Hight's description of Ms. Briggs's reaction to Mr. Collins's photo was not entirely accurate: for example, Ms. Briggs did not grab the picture of Mr. Collins but asked if she could see it and picked it up; Ms. Briggs began to openly weep on viewing the fifth photo, not the fourth (Mr. Collins's); and Ms. Briggs did not bend over at the waist when reviewing Mr. Collins's photo but rather bent her head down and put her hands to her eyes when reviewing the fifth photo. *See* Cabral Bonner Decl., Ex. 19 (video at @4:00-4:28).  In his deposition, Officer Hight stated that he included the above description in his probable affidavit based on what Officer Ruiz had told him. *See* Hight Depo. at 169; *see also* Ruiz Depo. at 86 ("I do remember telling [Officer Hight] that she was crying, and then she put her hand over her face, and I am not sure if it was her mouth specifically.  I'm not sure [of] the specifics, but I did give a description of her emotional response.").  Officer Hight also indicated in his deposition that he believes the video shows Ms. Briggs starting to become emotional with the fourth photo in the lineup (Mr. Collins) – which then carried over to her more obviously crying with the fifth photo in the lineup. *See* Hight Depo. at 161, 168.  Officer Ruiz gave the same assessment in his deposition. *See* Ruiz Depo. at 66, 87 (also testifying that Ms. Briggs first became emotional with the fourth photo).

On December 20, 2017, following the second photo lineup, Officer Hight prepared a probable cause affidavit to support an arrest warrant. *See* Hight Depo. at 229-30; *see also* Tran Decl., Ex. J (probable cause affidavit); Cabral Bonner Decl., Ex. 22 (Hight Case Notes at 8). According to Officer Hight, he did not include a reference to Mr. Warren (the pimp with dreads who had previously threatened Ms. Briggs) in his probable cause affidavit because he had been ruled out as a suspect. *See* Hight Depo. at 241.  Officer Hight also did not mention that Ms. Briggs had originally claimed that the shooter was someone with long dreads.  Furthermore, Officer Hight suggested in the affidavit that there were two 911 callers who saw the shooting and provided the license plate number (instead of just one person calling twice).  A state court judge signed off on the arrest warrant as well as a search warrant.

Later that day, Mr. Collins was arrested and his residence was searched.  The police located a semi-automatic handgun. *See* Hight Decl. ¶ 13; *see also* Cabral Bonner Decl., Ex. 22 (Hight Case Notes at 8).  Apparently, Officer Hight asked the crime lab to test fire the gun but he

11

did not recall getting any results back.  *See* Tran Decl., Ex. L (Tr. at 72).

Approximately eight months later, on August 7, 2018, Mr. Collins's preliminary hearing was held in state court.  During the hearing, Ms. Briggs testified.  She was questioned, *inter alia*, about her original claim that Mr. Warren and/or a person with long dreads was the shooter.  Officer Hight also testified during the hearing.  He was questioned, *inter alia*, about the first and second photo lineups.  He also testified about the two 911 calls and Ms. Briggs's call to the police telling them that someone had asked other prostitutes in the area about the shooting.  At the end of the hearing, the state court held Mr. Collins to answer for the offense.  *See* Tran Decl., Ex. L (Tr. at 93) (stating that "it does appear to this Court that there is a strong suspicion that the felony offense of attempted murder 187A/664 has been committed, and that the defendant committed it").

A year later, on or about August 30, 2019, Mr. Collins was released from jail.  *See* Collins Decl. ¶ 7.  No criminal trial was ever held.

B.    Defendants

Based on the above, Mr. Collins has sued the following individuals and entities:

- The City of Oakland.
- Chief Anne Kirkpatrick.  Chief Kirkpatrick was the Chief of Police during the relevant period.
- Officer Joel Hight.  Officer Hight was the main investigator in the criminal case.
- Officer A. Gatdula.  Officer Gatdula performed the wall-off traffic stop requested by Officer Hight.
- Officer Roberto Ruiz.  Officer Ruiz was the officer who actually showed Ms. Briggs the pictures used in the second photo lineup (in which Ms. Briggs ultimately identified Mr. Collins as the assailant).
- Ms. Dooher.  Ms. Dooher was the DDA who, according to Officer Hight, approved the conducting of a second photo lineup, the use of a wall-off stop to

United States District Court
Northern District of California

1    get a picture of Mr. Collins, and the formulation of the second photo lineup.[6]

2  C.    Causes of Action

3    Mr. Collins has asserted the following causes of action:

4    (1)    Conspiracy in violation of 42 U.S.C. § 1985 (against all Defendants).

5    (2)    Illegal search and seizure in violation of 42 U.S.C. § 1983 (against all
6    individual defendants).

7    (3)    Fraud in violation of 42 U.S.C. § 1983 (against the police officers).

8    (4)    Invasion of privacy in violation of 42 U.S.C. § 1983 (against the police
9    officers).

10    (5)    False arrest in violation of 42 U.S.C. § 1983 (against all individual defendants).

11    (6)    False imprisonment in violation of 42 U.S.C. § 1983 (against all individual
12    defendants).

13    (7)    Prosecutorial misconduct in violation of 42 U.S.C. § 1983 (against the DDA).

14    (8)    Malicious prosecution in violation of 42 U.S.C. § 1983 (against the police
15    officers).

16    (9)    Fabricated evidence in violation of 42 U.S.C. § 1983 (against the police
17    officers).

18    (10)    Suppression of exculpatory evidence in violation of 42 U.S.C. § 1983 (against
19    the municipality defendants).

20    (11)    Violation of the Fourth Amendment based on the act of a final policymaker in
21    violation of 42 U.S.C. § 1983 (against the municipality defendants).

22    (12)    Failure to train and supervise in violation of 42 U.S.C. § 1983 (against all
23    municipality defendants).

24    (13)    Violation of liberty interest in violation of 42 U.S.C. § 1983 (against all
25    individual defendants).

26

27    _____

28    [6] Mr. Collins also sued the County of Alameda – i.e., Ms. Dooher's employer.  However, the Court previously dismissed the federal claims against the County and no state law claims are pled against it.

(14)   Negligent supervision in violation of 42 U.S.C. § 1986 (against all individual defendants).

(15)   Violation of the Fourth Amendment based on a pattern, practice, or policy in violation of 42 U.S.C. § 1983 (against the municipality defendants).

(16)   Violation of the Fourth Amendment based on ratification in violation of 42 U.S.C. § 1983 (against the municipality defendants).

(17)   Conspiracy (against all individual defendants).

(18)   Violation of the right to privacy under the California Constitution (against all individual defendants).

(19)   Fraud (against the police officers).

(20)   False arrest (against the police officers).

(21)   False imprisonment (against the police officers).

(22)   Negligent failure to train and supervise and negligent retention under state law (against the individual defendants).

(23)   Negligent investigation under state law (against the police officers).

(24)   Malicious prosecution under state law (against the police officers).

(25)   Intentional infliction of emotional distress (against all individual defendants).

(26)   Defamation under state law (against all individual defendants).

(27)   Private attorney's fees for public benefit under state law (against all individual defendants).

Counts 1-16 are the federal claims; counts 17 and on are the state law claims.

## II.      LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that a "court shall grant summary judgment [to a moving party] if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could

1   reasonably find for the [nonmoving party]." *Id.* at 252. At the summary judgment stage, evidence

2   must be viewed in the light most favorable to the nonmoving party and all justifiable inferences

3   are to be drawn in the nonmovant's favor. *See id.* at 255.

4   Where a defendant moves for summary judgment based on a claim for which the plaintiff

5   bears the burden of proof, the defendant need only point to the plaintiff's failure "to make a

6   showing sufficient to establish the existence of an element essential to [the plaintiff's] case."

7   *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Fontenot v. Upjohn Co.*, 780 F.2d

8   1190, 1194 (5th Cir. 1986) (stating that, "if the movant bears the burden of proof on an issue,

9   either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must

10   establish beyond peradventure all of the essential elements of the claim or defense to warrant

11   judgment in his favor") (emphasis omitted).

**III.   MS. DOOHER'S MOTION FOR SUMMARY JUDGMENT**

13   Based on the Court's prior orders, the claims against Ms. Dooher are restricted to her

14   alleged approval of the second photo lineup. *See* Docket No. 45 (Order at 7). Because of this

15   restriction, some of the causes of action pled against Ms. Dooher in the TAC are not viable: the

16   tenth and thirteenth causes of action which are based on alleged suppression of exculpatory cell

17   phone evidence; the fourteenth and twenty-second causes of action which are essentially claims

18   for negligent supervision or training; and the twenty-sixth cause of action which asserts

19   defamation.[7]

20   As for the remaining claims against Ms. Dooher, they are essentially claims for illegal

21   seizure or violation of due process based on the following factual predicates: (1) Ms. Dooher told

22   Officer Hight that he could do a second photo lineup even though Ms. Briggs had not identified

23   Mr. Collins in the first photo lineup; (2) Ms. Dooher agreed with Officer Hight that a wall-off

---

[7] The Court also notes that Mr. Collins never provided a more definite statement with respect to his defamation claim as ordered by the Court, which is another basis for dismissal. *See* Docket No. 25 (Order at 18 n.5) (not addressing defense argument that there was an applicable privilege (under California Civil Code § 47) because "it is not even clear from the FAC what the factual basis for the defamation claim is[;] [b]ecause the Court is already giving Mr. Collins an opportunity to amend, it gives him leave to provide a more definite statement as to the factual basis of his defamation claim as well").

United States District Court
Northern District of California

traffic stop could be done in order to get a better/color photo of Mr. Collins; and (3) Ms. Dooher approved the second photo lineup as "formulated" by Officer Hight.

A.      Federal Claims

As to the federal causes of action, Ms. Dooher contends that, at the very least, she is entitled to qualified immunity, regardless of which factual predicate is at issue.

"Qualified immunity shields government officials under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *J.K.J. v. City of San Diego*, 42 F.4th 990, 999 (9th Cir. 2022) (internal quotation marks). The plaintiff bears the burden of proof on both prongs; a court has discretion which prong to address first. *See id.*

With respect to the second prong, the Ninth Circuit has noted as follows:

> In analyzing whether rights are clearly established, we look to then-existing "cases of controlling authority" or, absent such cases, to a "consensus" of persuasive authorities. "A clearly established right is one that is sufficiently clear that *every* reasonable official would have understood that what he is doing violates [it]." The Supreme Court has cautioned that we do not analyze whether rights are clearly established "at a high level of generality." Nor do we take the extreme opposite approach, requiring a prior case "on all fours." Our inquiry, instead, is whether "the violative nature of [the defendant's] particular conduct is clearly established . . . in light of the specific context of the case.'" Qualified immunity thus protects "all but the plainly incompetent or those who knowingly violate the law."

*Id.* at 1000 (emphasis added). In other words, qualified immunity "'gives government officials breathing room to make reasonable but mistaken judgments.'" *Sjurset v. Button*, 810 F.3d 609, 614 (9th Cir. 2015). For the reasons discussed below, the Court agrees with Ms. Dooher that she has qualified immunity from suit, whether the claim is predicated on the Fourth Amendment or due process.[8]

---

[8] For purposes of this opinion, the Court assumes that the due process claim is viable, although Ms. Dooher has argued that (1) there is no due process right to be free of an improper lineup but rather only a due process right to a fair trial; and (2) Mr. Collins's right to a fair trial could not have been impacted because the charges against him were eventually dismissed and his criminal case never proceeded to trial. *See Hensley v. Carey*, 818 F.2d 646, 649 (7th Cir. 1987) ("The rule against admission of evidence from unnecessarily suggestive lineups is a prophylactic rule designed to protect a core right, that is the right to a fair trial, and it is only the violation of the core right and not the prophylactic rule that should be actionable under § 1983.").

United States District Court
Northern District of California

1        1.      Allowing Second Photo Lineup

2        Mr. Collins claims that Ms. Dooher should not have approved the second photo lineup

3   because Ms. Briggs had not identified him in the first lineup.  But even if Mr. Collins is right that

4   Ms. Dooher thereby violated his constitutional rights, the question is whether every reasonable

5   official would have understood there to be a constitutional violation.  The Court cannot say there

6   would be such a consensus, particularly because, as Officer Hight testified during his deposition,

7   he told Ms. Dooher that Ms. Briggs was not sure about her pick and wanted to do a second photo

8   lineup (in color).  *See, e.g.*, Hight Depo. at 21 ("I was very frank with [Ms. Dooher] about the

9   [first] photo lineup.  That [Ms. Briggs] picked a filler.  That it was – it was not the suspect who we

10  had – it wasn't the suspect who we thought was in the case.  [¶] And that based off of the things

11  that she was saying that it was black and white, that some of the photos – the degradation of some

12  of the copies because of the way that I formulated the first lineup being black and white photos

13  [*i.e.*, so the background color would not differ].  She was hemming and hawing that the photo

14  lineup was not an accurate depiction of the subjects in the photos.").  Courts have held, as a

15  general matter, that it is permissible for a suspect to appear in more than one lineup.  *See United*

16  *States v. Davenport*, 753 F.2d 1460, 1463 (9th Cir. 1985) (stating that "[t]he fact that [defendant]

17  was the only individual common to the photo spread and the lineup cannot, without further indicia

18  of suggestiveness, render the lineup conducive to irreparable misidentification"); *United States v.*

19  *Ellis*, No. 13-CR-00818 PJH, 2015 U.S. Dist. LEXIS 147949, at *10 (N.D. Cal. Oct. 29, 2015)

20  (stating that "[t]he fact that [defendant] appeared in two different lineups does not, in and of itself,

21  render the latter lineup unduly suggestive"; "where the record reflects that the witness explicitly

22  stated that [defendant] looked like the driver when shown the video lineup, [defendant's]

23  appearance in a prior photo lineup, which was shown to the witness four months earlier, did not

24  give rise to a substantial likelihood of misidentification"); *Amante v. Virga*, No. C 11-00975 SBA

25  (PR), 2014 U.S. Dist. LEXIS 142051, at *49-50 (N.D. Cal. Sep. 30, 2014) (noting that "using 'a

26  suspect's image in successive lineups might be suggestive if the same photograph were reused or

27  if the lineups followed each other quickly enough for the witness to retain a distinct memory of the

28  prior lineup'[;] [a]t the same time, there is no brightline rule that prohibits law enforcement

United States District Court
Northern District of California

United States District Court
Northern District of California

1   officials from '[a] further attempt to elicit a positive identification of a particular suspect from an

2   eyewitness who does not identify the suspect from the first photograph . . . .'").  There is no

3   Supreme Court or Ninth Circuit precedent to the contrary.  Under the undisputed facts, the Court

4   cannot find Ms. Dooher's conclusion that a second photo lineup could be conducted violated

5   clearly established law.

6          In his papers, Mr. Collins seems to suggest that there is a question of fact as to whether

7   Officer Hight actually told Ms. Dooher that Ms. Briggs was not sure about her pick and that,

8   absent that information, a second photo lineup would have been clearly unlawful.  Mr. Collins

9   claims that, during her deposition, Ms. Dooher *denied* ever having a conversation with Officer

10  Hight about the photo lineup.  *See* Opp'n to Dooher Mot. at 3 ("Because DDA Dooher denies this

11  conversation occurred, there is a triable issue of fact as to whether Detective Hight conveyed that

12  Ms. Briggs desired a second photograph, which was the only justification provided by anyone for

13  continuing to target innocent Plaintiff.").  But Mr. Collins has not fairly characterized Ms.

14  Dooher's deposition testimony.  Ms. Dooher stated that she could not *recollect* having a

15  conversation with Officer Hight.  Contrary to what Mr. Collins suggests, this is not the same thing

16  as an outright denial.[9]  *Cf. Chavez v. Ill. State Police*, 251 F.3d 612, 634 (7th Cir. 2001) (noting

17  _____

18  [9] The closest to a denial that Ms. Dooher made was the following:

19          *I do not have any recollection not only of speaking to Officer Hight*
             *about a wall stop strategy.  I don't believe I have ever had that*
20          *conversation with officers.*  I have had very similar conversation[s]
             with officers with respect to social media photos, as usually when it
21          has come up in the context of photo lineups is the use of social
             media photos.  So I have had a whole number of conversations about
22          that, or use of driver's license pictures or juvenile booking photos.
             So something outside of the PFN photo, but not in a wall stop
23          context no.

24  Dooher Depo. at 71 (emphasis added).  Ms. Dooher then went on to say in her deposition that "I
    don't think there is anything prohibiting someone from doing a wall stop to, you know, take a cell
25  phone photo of someone or whatever it may be":

26          I mean, now, assuming that the vehicle stop was supported by
             reasonable suspicion to detain or probable cause to arrest for a
27          vehicle violation, let's say.  I don't think that there is anything
             prohibiting taking a photo of someone either surreptitiously or, you
28          know, "Hey, I am taking your photo."  Like, I don't think there is
             anything that would prohibit an officer from doing that in the course

that "the officers do not claim that they did not stop Lee, only that they do not recall doing so");

*see also United States v. Alawi*, No. 20-CR-00192(JLS)(JJM), 2021 U.S. Dist. LEXIS 238079, at

*9 (W.D.N.Y. Nov. 1, 2021) (stating that "'[n]ot recalling something is not the same as denying

it'"). This failure of memory does not contradict Officer Hight's testimony and does not create a

disputed issue of fact.[10]

### 2. Validity of Wall-Off Traffic Stop

Mr. Collins also seeks to hold Ms. Dooher liable because she approved the wall-off traffic

stop. As an initial matter, the Court notes there is no indication that, before the stop took place,

Ms. Dooher approved the police carrying out an illegal stop – *i.e.*, one not supported by reasonable

suspicion or probable cause. *See* Dooher Depo. at 71, 76-77 (not recollecting discussing a wall-off

stop with Officer Hight but stating that, "assuming that the vehicle stop was supported by

reasonable suspicion to detain or probable cause to arrest for a vehicle violation, . . . I don't think

that there is anything prohibiting taking a photo of someone surreptitiously or, you know, 'Hey, I

am taking your photo'"); *cf.* Cabral Bonner Decl., Ex. 56 (email from Officer Hight) (stating,

"Please **develop independent PC for a stop** and forward the FC . . . .") (emphasis in original).

To the extent Mr. Collins asserts that the actual traffic stop (conducted by Officer Gatdula)

was not in fact legal because the officer ended up stopping Mr. Collins without reasonable

suspicion or probable cause, that is beside the point – at least with respect to Ms. Dooher. There is

nothing to suggest that Ms. Dooher later knew or should have known that the traffic stop, as

carried out, was not supported by reasonable suspicion or probable cause. In the absence of

knowledge on the part of Ms. Dooher, she cannot be held liable.

---

> of a wall stop assuming that the actual stop itself was supported by,
> by a standard of proof necessary.
>
> *I just don't have any recollection of ever speaking to an officer*
> *about using that procedure.*

Dooher Depo. at 76 (emphasis added).

[10] Notably, if Mr. Collins is now suggesting that the conversation between Officer Hight and Ms. Dooher never took place (*i.e.*, Officer Hight was lying about the conversation), then there would be no basis to assert liability against Ms. Dooher at all. She never would have approved the conducting of a second lineup.

Mr. Collins fares no better to the extent his argument is that Ms. Dooher violated his rights because the actual traffic stop (conducted by Officer Gatdula) was improperly prolonged, *i.e.*, in order to obtain a better/color picture of Mr. Collins.  The Supreme Court has held that "[a] lawful roadside stop begins when a vehicle is pulled over for investigation of a traffic violation" and that "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure so long as those inquiries do *not* measurably extend the duration of the stop." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009); *see also Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (stating that "the Fourth Amendment tolerate[s] certain unrelated investigations that [do] not lengthen the roadside detention"; "[a]n officer, in other words, may conduct certain unrelated checks during an otherwise lawful traffic stop," but "he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual").  Even if the stop in this case were measurably prolonged, there is nothing to suggest that Ms. Dooher knew or should have known that the traffic stop, as carried out, was unduly prolonged.  *Cf. Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1293 n.16 (9th Cir. 1999) ("Although a police officer is entitled to rely on information obtained from fellow law enforcement officers, see this in no way negates a police officer's duty to reasonably inquire or investigate these reported facts.").  For example, even if Ms. Dooher saw that the picture of Mr. Collins had been taken with a cell phone instead of with the officer's body-worn camera (this assumes that Ms. Dooher saw a non-photoshopped copy of the picture), that fact in and of itself would not suggest that the stop was improperly prolonged, as a cell phone photo can be taken quickly.

### 3. Whether Second Photo Lineup Was Unduly Suggestive

Finally, Mr. Collins has claims against Ms. Dooher based on the assertion that Officer Hight's second photo lineup was unduly suggestive and therefore Ms. Dooher should not have approved it when it was shown to her.  In support of his claim, Mr. Collins notes the following: all background was edited out of the lineup (so that there were only floating heads), which included, for Mr. Collins, the glasses he had on the top of his head; Mr. Collins's photo was displayed in the fourth position, which was the same as in the first photo lineup; and Mr. Collins's photo stood out

United States District Court
Northern District of California

1    because his face was at an angle while the other photos showed men looking straightforward.  As

2    above, even if Mr. Collins is correct that the second photo lineup was unduly suggestive, Ms.

3    Dooher would still be entitled to qualified immunity so long as not every reasonable official would

4    have understood there to be a constitutional violation.

5            The Court concludes that a reasonable DDA could have believed that the second photo

6    lineup was not unduly suggestive (even if ultimately mistaken on this point).  A reasonable DDA

7    could approve the editing out of background because the point of doing such would be to get rid of

8    possible suggestiveness.  As for the fact that Mr. Collins's glasses at the top of his head were

9    photoshopped out,[11] it is not clear that Ms. Dooher knew of that fact (*i.e.*, it is not clear that she

10   actually saw the non-photoshopped image).  But even if Ms. Dooher knew that his glasses had

11   been edited out, it would not be unreasonable for a DDA to give a "pass" to this edit, particularly

12   because Mr. Collins's driver's license photo used in the first lineup did not show him wearing

13   glasses.  Also, glasses are simply accessories (nonpermanent) that are easily removable.  Finally,

14   including Mr. Collins's glasses in the lineup might well have made him stand out.  *Cf. United*

15   *States v. Garcia-Alvarez*, 541 F.3d 8, 13-14 (1st Cir. 2008) (concluding that the removal of the

16   defendant's glasses was not impermissibly suggestive: "Garcia's second claim here is peculiar in

17   that most identification challenges we and our sister circuits encounter involve the presence of a

18   distinguishing characteristic that stands out during the identification process"; "[t]he removal of

19   Garcia's eyeglasses as well as the use of the orange jumpsuits were intended to preserve the

20   integrity of the police lineup and advance the goal of uniformity").

21           Regarding the position of Mr. Collins in the second lineup, it is not clear that Ms. Dooher

22   knew this was the same position he had in the first lineup.  Although Officer Hight testified that he

23   showed Ms. Dooher the first lineup, *see* Hight Depo. at 19, at least some time passed before he

24   showed her the formulation for the second lineup.  Furthermore, even if Ms. Dooher knew that the

25   position was the same in the first and second lineups, the question is whether this would have

26   made the second lineup unduly suggestive to Ms. Briggs.  The time between the first and second

27

28   _____
     [11] Mr. Collins suggests that his glasses should have been included because that would have
     supported his not being the assailant.

United States District Court
Northern District of California

lineups was about a week.  It would not be unreasonable for a DDA to conclude that a victim would not remember positioning in a photo lineup so long as the lineups were separated by a nonnegligible period of time.  *Cf. United States v. Rich*, No. 87-3062, 1988 U.S. App. LEXIS 21755, at *10-11 (9th Cir. Mar. 18, 1988) (with respect to defendant's contention that "the lineup procedure was unnecessarily suggestive because he was in the third position in both the photo montage and the subsequent lineup," finding "no plain error[;] [t]he procedures used were not impermissibly suggestive: the lineup occurred several weeks after the witnesses were shown the photo montage, and they were unlikely to recall and associate the persons in a particular position in the two displays").[12]

As for the angle of Mr. Collins's face in his photo, even if this might be deemed suggestive, it was not clearly established at the relevant time that that was so unduly suggestive as to violate the Constitution.  A number of court decisions had actually suggested otherwise.  *See United States v. Burdeau*, 168 F.3d 352, 357 (9th Cir. 1999) (rejecting defendant's contention photo lineup was impermissibly suggestive "because his picture was placed in the center of the array, was darker than the rest, and was the only one in which the eyes were closed"; stating that these were "insubstantial differences between the defendant's photograph and the others [that] do not in themselves create an impermissible suggestion that the defendant is the offender"); *accord Dokins v. Montgomery*, No. CV 17-1269 PA (AS), 2018 U.S. Dist. LEXIS 220585, at *47 (C.D. Cal. Dec. 28, 2018) (finding no due process violation even though "Petitioner's head is held at a different angle than the other photographs," "some of the individuals have longer hair than Petitioner and some have darker skin tone"); *Garcia v. Biter*, No. CV 140-9016 JLS (AFM), 2016 U.S. Dist. LEXIS 186207, at *35 (C.D. Cal. Nov. 30, 2016) (finding no basis for habeas relief even though, unlike the other photos, the photo of petitioner showed him "'looking down and away'": "this distinction is too insubstantial to show that the procedure was tainted, and "the photographs were alike in significant respects" (ethnicity, age, and hairstyle)); *United States v.*

---

[12] Ms. Dooher also argues that the repeat position was not unduly suggestive because "no matter where in the array a defendant's photograph is placed, he can argue that its position is suggestive." *People v. Johnson*, 3 Cal. 4th 1183, 1217 (1992).

United States District Court
Northern District of California

*Guevara*, 745 F. Supp. 2d 1039, 1047 (N.D. Cal. 2010) (rejecting the defense argument that the

"line-up was impermissibly suggestive because he was the only suspect looking down; "a minor

difference in face position does not render a line-up impermissibly suggestive"); *People v. West*,

154 Cal. App. 3d 100, 105 (1984) (noting that lineup presented to the victim "contain[ed] a full

face and profile picture of each person" and it was only "defendant's profile [that] fac[ed] the

opposite direction from the other five pictures"; but "the point of concern to the witness is the

person's features, not the direction he is facing").  *See generally Walden*, 990 F.3d at 1198-99

(noting that "a police-designed lineup that features individuals 'grossly dissimilar in appearance to

the suspect' is improperly suggestive"; "'[m]ere variations in appearance among persons or

photographs presented to a witness do not automatically invalidate a pretrial identification'").[13]

    Finally, the authorities cited above also lead to the conclusion that, even if the Court were

to consider the issues above collectively rather than standing alone (*i.e.*, the edited-out glasses in

the second photo, *plus* the fourth position of Mr. Collins's photo in both lineups, *plus* the angle of

his face in the second photo), Ms. Dooher still is entitled to qualified immunity.  It was not clearly

---

[13] *Accord United States v. Carbajal*, 956 F.2d 924, 929 (9th Cir. 1992) (rejecting defendant's
contention that the photo lineup was "impermissibly suggestive because he was the only person in
the photospread who was wearing a wig and had bruises on his face"; stating that "[a]ll six of the
pictures in the photospread were of Hispanic males in the same age range, with similar skin, eye,
and hair coloring," and each had a moustache and about the same hair length); *United States v.
Nash*, 946 F.2d 679, 681 (9th Cir. 1991) (rejecting defendant's criticism of "the photospread
because one of the photographs was of a Latino man, only [defendant] and two others had light
complexions, and only [defendant] and the man [defendant] contends is Latino had afro
hairstyle[;] [w]e find the photospread to be a balanced presentation that was not suggestive");
*Mitchell v. Goldsmith*, 878 F.2d 319, 323 (9th Cir. 1989) (rejecting defendant's argument that his
picture in the lineup "'stood out'" because "he was the only person in the lineup who was
photographed against a blue background[,] four of the seven individuals in the photographic
lineup had lighter complexions than his[,] and [his] photo was the only photo with a 1981 date (the
other photographs had arrest dates of 1979 or 1980)"; stating that "the background colors varied
among all the pictures" and "at least two of the other men in the lineup closely resembled
[defendant]," and not finding "the 1981 date on [defendant's] photo . . . unduly suggestive" even
though that was the date of the underlying crime); *Moore v. Scribner*, No. C 04-4064 MMC (PR),
2007 U.S. Dist. LEXIS 48356, at *14 (N.D. Cal. June 27, 2007) (stating that, "[g]iven the
similarity among the individuals depicted in the photographs with respect to their race, gender,
clothing, facial hair, and hair styles, the fact that [defendant] had two earrings whereas others had
one or none is a relatively minor discrepancy that did not impermissibly suggest [defendant] was
the suspect"); *Page v. Borg*, No. C-91-3986-VRW, 1993 U.S. Dist. LEXIS 17773, at *6 (N.D.
Cal. Dec. 6, 1993) (stating that, "[w]hile petitioner may be the only member of the lineup wearing
green slippers, petitioner has failed to convince the court that this fact alone makes the lineup
unconstitutionally suggestive").

1    established at the time that this constellation of facts would be deemed unduly suggestive.  Mr.

2    Collins has not cited Supreme Court or Ninth Circuit precedent clearly establishing the facts in

3    this case violated the Constitution.

4    B.    State Law Claims

5          For the reasons stated above, the federal claims against Ms. Dooher cannot be sustained.

6    This leaves Mr. Collins with state law claims.  With respect to the state law claims, Ms. Dooher

7    asserts that she also has immunities that give her protection from suit.  She focuses in particular on

8    California Government Code §§ 820.2 and 821.6.  *See* Dooher Mot. at 19.  The Court is not

9    persuaded.

10          1.    Section 820.2

11          California Government Code § 820.2 provides as follows: "Except as otherwise provided

12   by statute, a public employee is not liable for an injury resulting from his act or omission where

13   the act or omission was the result of the exercise of the discretion vested in him, whether or not

14   such discretion be abused."  Cal. Gov't Code § 820.2.  As the California Supreme Court has

15   explained, "[i]mmunity is reserved for those basic policy decisions [which have] . . . been

16   [expressly] committed to coordinate branches of government, and as to which judicial interference

17   would thus be unseemly"; "there is no basis for immunizing lower level decisions that merely

18   implement a basic policy already formulated."  *Barner v. Leeds*, 24 Cal. 4th 676, 685 (2000)

19   (emphasis and internal quotation marks omitted).

20          In a prior order, the Court held that § 820.2 protected the individual prosecutors with

21   respect to their decision to prosecute but *not* with respect to the approval of the second photo

22   lineup.  *See* Docket No. 25 (Order at 17-18) (noting that "denying immunity [with respect to the

23   approval of the second photo lineup] would not constitute unseemly judicial interference or

24   encroachment on prosecutorial independence, particularly when the lineup took place before any

25   arrest of Mr. Collins (*i.e.*, well before the decision to prosecute)").  Based on the evidence of

26   record, there is no reason to depart from this prior holding.

27          2.    Section 821.6

28          California Government Code § 821.6 provides as follows: "A public employee is not liable

24

United States District Court
Northern District of California

1    for injury caused by his instituting or prosecuting any judicial or administrative proceeding within

2    the scope of his employment, even if he acts maliciously and without probable cause."  Cal. Gov't

3    Code § 821.6.

4         But in a prior order, the Court already held that the application of this immunity – with

5    respect to DDA Carvolth – "is limited.  Specifically, only the malicious prosecution claim is

6    subject to dismissal based on § 821.6."  Docket No. 25 (Order at 18).  The Court cited in support,

7    *inter alia*, *Sharp v. County of Orange*, 871 F.3d 901 (9th Cir. 2017), where the Ninth Circuit

8    acknowledged that "intermediate appellate courts have expanded the [§ 821.6] immunity to

9    investigative steps taken prior to a judicial proceeding, including action by police officers"[14] but,

10   "because California's highest court has not extended § 821.6 immunity to actions outside of

11   malicious prosecution, this immunity does not apply here."  *Id.* at 920-21; *see also Garmon v. Cty.*

12   *of L.A.*, 828 F.3d 837, 847 (9th Cir. 2016); *Mendez v. Cty of L.A.*, 897 F.3d 1067, 1083 (9th Cir.

13   2018).  There is no reason why this same analysis would not apply to Ms. Dooher.[15]

14        Implicitly recognizing this problem, Ms. Dooher cites to a Supreme Court decision from

15   1940 which noted as follows:

16        A state is not without law save as its highest court has declared it.
17        There are many rules of decision commonly accepted and acted
          upon by the bar and inferior courts which are nevertheless laws of
18        the state although the highest court of the state has never passed
          upon them.  In those circumstances a federal court is not free to
19        reject the state rule merely because it has not received the sanction
          of the highest state court, even though it thinks the rule is unsound
20        in principle or that another is preferable.  State law is to be applied
          in the federal as well as the state courts and it is the duty of the
21        former in every case to ascertain from all the available data what the
          state law is and apply it rather than to prescribe a different rule,
22        however superior it may appear from the viewpoint of "general law"

23   ---

     [14] The Ninth Circuit cited as an example *Gillan v. City of San Marino*, 147 Cal. App. 4th 1033
24   (2007), which is one of the cases that Ms. Dooher relies in her motion.  *See* Dooher Mot. at 20.
     *Gillan*, in turn, cited additional authority on which Ms. Dooher relies – *e.g.*, *Ingram v. Flippo*, 74
25   Cal. App. 4th 1280 (1999); *Cappuccio, Inc. v. Harmon*, 208 Cal. App. 3d 1496 (1989); and
     *Amylou R v. County of Riverside*, 28 Cal. App. 4th 1205 (1994).  All of the cases cited by Ms.
26   Dooher (including these) predate *Sharp*.

27   [15] Following the Court's order, Mr. Collins dropped the state law malicious prosecution claim
     against Ms. Carvolth but continued to assert it against the individual police officers.  *See also*
28   TAC at 124 (asserting, in twenty-fourth cause of action, a claim for malicious prosecution against
     the Oakland police officer defendants).

1
2

> and however much the state rule may have departed from prior
> decisions of the federal courts.  *See Erie Railroad Co. v. Tompkins*,
> [304 U.S. 64], 78 [(1938)]; *Russell v. Todd*, [309 U.S. 280], 203
> [(1943)].

3   *West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 236-37 (1940).  But Ms. Dooher ignores the fact that,

4   in *Sharp*, the Ninth Circuit cited a California Supreme Court decision, *Sullivan v. County of Los*

5   *Angeles*, 12 Cal. 3d 710 (1974), to support its conclusion that "§ 821.6 immunity does not extend

6   beyond malicious-prosecution claims."  *Sharp*, 871 F.3d at 920.  Until the California Supreme

7   Court rules otherwise, this Court is bound by the Ninth Circuit's interpretation of California law.

8   The Court therefore holds that the state law immunity is not applicable.

9           3.      Merits of State Law Claims

10          Although Ms. Dooher's assertion that she is protected by state law immunities is not

11   convincing, the Court has concerns about the viability of the state law claims.  For example, in

12   their own motion for summary judgment, the City Defendants have raised the question of whether

13   there is a viable claim for invasion of the right to privacy because "a person does not have a

14   reasonable expectation of privacy against being photographed in public."  City Defs.' Mot. at 37.

15   As discussed below, the Court finds that this argument has merit.  Also, Mr. Collins seems to have

16   raised some claims that are not in fact true causes of action (*e.g.*, conspiracy and private attorney's

17   fees).  Finally, the Court's rulings above (*i.e.*, that not every reasonable official would find a

18   constitutional violation) also put into question the claim for intentional infliction of emotional

19   distress.

20          Because the Court has concerns about the viability of the state law claims asserted against

21   Ms. Dooher, the Court orders Ms. Dooher to address the *merits* of those claims (under a summary

22   judgment standard).  Ms. Dooher shall file a brief addressing the merits of the state law claims

23   (that have not already been dismissed) within three weeks of the date of this order.  Mr. Collins

24   shall thereafter have two weeks to file a brief in response.  After this briefing is completed, the

25   Court shall determine whether further briefing and/or a hearing is necessary.

26   **IV.      CITY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

27          The City Defendants are Officer Hight, Officer Gatdula, Officer Ruiz, Chief Kirkpatrick,

28   and the City of Oakland.  For their pending motion, the Court shall determine whether summary

United States District Court
Northern District of California

26

judgment is appropriate by evaluating each defendant separately – although it is cognizant of Mr. Collins's position that there was a conspiracy among the City Defendants (as well as Ms. Dooher) to violate his civil rights.  Before considering each defendant, however, the Court briefly addresses claims raised by Mr. Collins that are clearly lacking in merit – regardless of which defendant(s) is involved.

- Claim for defamation.  The defamation claim is pled in conclusory terms only. In a prior order addressing a motion to dismiss brought by the County Defendants, the Court specifically noted that it would not address the defense argument that there was an applicable privilege under California Civil Code § 47 because it was not clear from the then-operative complaint what the factual basis for the claim was.  The Court gave Mr. Collins an opportunity to provide a more definite statement as to the factual basis of his defamation claim.  *See* Docket No. 25 (Order at 18 n.5).  He never did so.

- Claims based on suppression of exculpatory evidence.  Several of the federal and state claims are based on an allegation that the City Defendants suppressed exculpatory evidence – specifically, video on Mr. Collins's cell phone which indicated he was at home with his girlfriend several hours before the shooting. *See* TAC ¶ 112 (alleging that "Mr. Collins' cell phone [had] an ironclad alibi as to his location on the night and time of the shooting" because it had a "video revealing Mr. Collins videotaping his long-time girlfriend and lover[;] [t]he video is date stamped 'December 6, 2017, Wednesday, 10:01 pm'").  The City Defendants have made various arguments as to why these claims lack merit: for instance, because "the video was never suppressed [as] both [Mr. Collins] (who recorded the video) and his girlfriend (who was recorded in the video) obviously knew of the video's existence, knew it was on [Mr. Collins's] cell phone, and knew that it was accessible to them even without the phone because they downloaded it off the remote, cloud-based storage as recited in the TAC ¶ 116."  City Defs.' Mot. at 41.  The Court finds this argument persuasive and

27

Mr. Collins does not challenge it in his opposition.

- Claims based on invasion of privacy.  In some claims, Mr. Collins has suggested that his right to privacy was violated because his picture was taken during the "ruse" wall-off traffic stop. *See, e.g.*, TAC ¶ 321.  The City Defendants contend that such claims lack merit because "a person does not have a reasonable expectation of privacy against being photographed in public." City Defs.' Mot. at 37.  The Court agrees.  *See, e.g.*, *Folgelstrom v. Lamps Plus, Inc.*, 195 Cal. App. 4th 986, 990 (2011) ("The elements of a cause of action for violation of the California Constitution's guaranteed right to privacy are '(1) a legally protected privacy interest; (2) a reasonable expectation of privacy in the circumstances; and (3) conduct by defendant constituting a serious invasion of privacy.'").

- Claims based on lies told to Mr. Collins during his interrogation.  The City Defendants essentially contend that the police are allowed to tell noncoercive lies as standard interrogation techniques.  Although Mr. Collins continues, in his opposition brief, to refer to these lies in his description of the events, *see, e.g.*, Opp'n at 12, he does not substantively challenge the legal argument made by Defendants.

With these claims disposed of, the Court now turns to the main federal and state claims asserted against each defendant.

A.     Officer Hight

As a practical matter, the main alleged wrongdoer in the case is Officer Hight.  Although Mr. Collins has raised a number of federal and state claims against Officer Hight, they largely boil down to claims for false arrest/imprisonment and malicious prosecution – which Mr. Collins effectively concedes in his opposition.  *See* Opp'n at 14 (arguing that "Defendant Hight unconstitutionally engineered Mr. Collins' arrest by creating (1) an unnecessary and unconstitutionally suggestive second photo lineup, (2) fabricating inculpatory evidence and omitting profoundly exculpatory evidence from his *Ramey* Warrant, and (3) fabricating evidence

1   during the preliminary hearing, all of which foreseeably resulted in Mr. Collins' wrongful arrest

2   and confinement for nearly two (2) years").  Because these are the basic claims for relief, the City

3   Defendants have, not surprisingly, honed in on the issue of probable cause.

4           "In determining whether there was probable cause to arrest, [a court] look[s] to 'the totality

5   of circumstances known to the arresting officers, [to determine if] a prudent person would have

6   concluded there was a fair probability that [the suspect] had committed a crime.'" *Crowe v. Cty.*

7   *of San Diego*, 593 F.3d 841, 867 (9th Cir. 2010); *see also United States v. Gourde*, 440 F.3d 1065,

8   1069 (9th Cir. 2006) (noting that fair probability does not mean "certainty or even a

9   preponderance of the evidence").  "While conclusive evidence of guilt is . . . not necessary under

10  this standard to establish probable cause, '[m]ere suspicion, common rumor, or even strong reason

11  to suspect are not enough.'"  *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007).

12          1.      <u>False Arrest/Imprisonment Claim Based on Judicial Deception</u>

13          As an initial matter, the Court notes that, to the extent Mr. Collins has raised claims for

14  false arrest/imprisonment, he actually has two different kinds of such claims: (1) a "garden-

15  variety" false/arrest imprisonment claim in which the theory is that the seizure was lacking in

16  probable cause and (2) a false arrest/imprisonment claim based on judicial deception.  *See Chism*,

17  661 F.3d at 386 n.9 (9th Cir. 2011) (contrasting the two types of claims: in a garden-variety claim,

18  the claim is that probable cause is facially lacking and an officer "'enjoys qualified immunity

19  unless the warrant application is so lacking in indicia of probable cause as to render official belief

20  in its existing unreasonable'"; in a judicial deception claim, the claim is that an officer misled a

21  judge when applying for a warrant).  The Court begins with the judicial deception claim.

22          For this claim, Mr. Collins asserts that Officer Hight made false or misleading

23  representations or omissions to the state court judge who was presented with the arrest warrant and

24  to the state court judge who presided over the preliminary hearing in the criminal proceedings.  In

25  order for Mr. Collins to prevail on the claim, he must show that Officer Hight "'deliberately or

26  recklessly made false statements or omissions'" and that those statements or omissions "'were

27  material to the finding of probable cause.'"  *Smith v. Almada*, 640 F.3d 931, 937 (9th Cir. 2011)

28  (addressing a § 1983 judicial deception claim).  "[G]overnmental employees are not entitled to

United States District Court
Northern District of California

1    qualified immunity on judicial deception claims."  *Chism*, 661 F.3d at 393 (noting that, "'if an

2    officer submitted an affidavit that contained statements he knew to be false or would have known

3    were false had he not recklessly disregarded the truth and no accurate information sufficient to

4    constitute probable cause attended the false statements, . . . he cannot be said to have acted in a

5    reasonable manner, and the shield of qualified immunity is lost'").

6         In their papers, the City Defendants argue that, even if Officer Hight made

7    misrepresentations or omissions in his probable cause affidavit or in his testimony at the

8    preliminary hearing, is still entitled to summary judgment because those misrepresentations or

9    omissions were not material.  That is, Officer Hight's representations, "'once corrected and

10   supplemented,'" would have "provided [each state court judge] with a substantial basis for finding

11   probable cause."  *Chism*, 661 F.3d at 389; *see also Smith*, 640 F.3d at 937 (stating that "[t]he

12   materiality element – a question for the court – requires the plaintiff to demonstrate that 'the

13   magistrate would not have issued the warrant with false information redacted, or omitted

14   information restored'").

15        To the extent Mr. Collins's judicial deception claim is predicated on federal law, the issue

16   of materiality is a legal one for the Court to decide.  *See Chism*, 661 F.3d at 389 ("Our inquiry into

17   whether the false statements and omissions were material is a purely legal question, which we

18   analyze de novo."); *see also Butler v. Elle*, 281 F.3d 1014, 1024 (9th Cir. 2002) ("Materiality is

19   for the court, state of mind is for the jury.").  It is not clear from Mr. Collins's papers whether he

20   takes the position that, for the state law claim, materiality is a factual question.  However, even if

21   he were to take that position, the Court concludes that Mr. Collins cannot survive summary

22   judgment.  The Court concludes that, as a legal matter, the misrepresentations and omissions

23   identified by Mr. Collins were not material; moreover, even if materiality were a factual question,

24   no reasonable jury could conclude that the misrepresentations and omissions were material.[16]  In

25

26   _____

27   [16] The Court notes that the preclusion argument made by the City Defendants raises similar issues.
     *See McCutchen v. City of Montclair*, 73 Cal. App. 4th 1138, 1147 (1999) (noting that a
     preliminary hearing probable cause finding will not be given preclusive effect if, *e.g.*, "the officer
28   misrepresents the nature of the evidence supporting probable cause and that issue is not raised at
     the preliminary hearing").

reaching this conclusion, however, the Court emphasizes that it is not in any way condoning Officer Hight's conduct.  Indeed, the evidence strongly suggests that Officer Hight was less than forthright, particularly in his probable cause affidavit, and his misstatements and omissions were inexcusable and should not be tolerated by the Police Department.  Nonetheless, given the applicable legal standard for materiality in assessing Mr. Collins' claims herein, the misrepresentations and omissions were not material.

      a.    <u>Probable Cause Affidavit</u>

In his papers, Mr. Collins identifies a number of misrepresentations and omissions made in the probable cause affidavit.  Most notably:

- Officer Hight omitted the fact that Ms. Briggs initially described the assailant as someone with dreadlocks.  (Mr. Collins is bald.)
- Officer Hight omitted the fact that Ms. Briggs initially suggested that Mr. Warren could have been the assailant.
- Officer Hight omitted the fact that Ms. Briggs stated she did not see the shooter's face.
- Officer Hight omitted the fact that, for the first photo lineup, Ms. Briggs wrote "no" under Mr. Collins's photo.
- Officer Hight omitted the fact that, with respect to the second photo lineup, Ms. Briggs indicated that four of the six men had features similar to the assailant and that she initially indicated that the assailant was the man in the second photo (*i.e.*, someone other than Mr. Collins).
- Officer Hight misrepresented that Ms. Briggs had an emotional reaction to Mr. Collins's photo – *e.g.*, she did not grab his photo, she did not openly cry when looking at his photo, and she did not bend at the waist in reviewing his photo.

These misrepresentations and omissions are undoubtedly troubling.  First, there are a number of them.  Second, the omitted information clearly raised questions about the reliability of Ms. Briggs's ultimate identification of Mr. Collins as the shooter.  Third, the characterization of Ms. Briggs's emotional reaction to Mr. Collins's photo in the second lineup suggested that Ms.

United States District Court
Northern District of California

1    Briggs's identification of Mr. Collins as the shooter was more reliable than it was.  These facts

2    have, to say the least, caused the Court serious concern.

3            Nevertheless, the legal analysis for a judicial deception claim requires that the Court

4    consider whether there would be a substantial basis for a probable cause finding if the state court

5    judge had been provided with corrected information.  *See Chism*, 661 F.3d at 389 (stating that

6    "[t]he false statements and omissions contained in [the officer's] affidavit were material if 'the

7    affidavit, once corrected and supplemented,' would not have provided a magistrate judge with a

8    substantial basis for finding probable cause").  Here, this materiality analysis weighs in the City

9    Defendants' favor.  For example, it is true that Ms. Briggs initially identified the assailant as

10   someone with dreads and stated that it could have been Mr. Warren, a pimp who has dreads,

11   because he had previously threatened her, a fact which should have been but was not brought to

12   the state court judge's attention.  But well before the application for an arrest warrant, the police

13   determined that Mr. Warren was not a suspect since he had been in custody at the time of the

14   shooting.  Also, within several hours after the shooting, Ms. Briggs indicated (without any police

15   prompting and without any knowledge that Mr. Warren was in custody at the time) that she did

16   not think Mr. Warren had shot her and that she believed the assailant was a john whom she had

17   just "dated" – *i.e.*, because the car he was driving looked like the car that the shooter was driving.

18   Also, although Ms. Briggs did not see the face of the shooter while driving the car, she did see the

19   face of her john.

20           As for the first lineup, it is true that Ms. Briggs had written "no" under Mr. Collins's

21   photo, but she was not sure about her pick from the first lineup because it was in black and white.

22   *See, e.g.*, Tran Decl., Ex. L (Tr. at 27) (Ms. Briggs testifying at the preliminary hearing that she

23   "remember[ed] saying that she would not be able to tell [based on the first lineup] because I did

24   not see the person in black and white").  Ms. Briggs's ruling out Mr. Collins was less than certain.

25           Regarding the second lineup, even though Officer Hight did not state that Ms. Briggs had

26   made comments on four of the six photos, indicating each had some similarities with the assailant,

27   Ms. Briggs ultimately chose Mr. Collins's photo.  Also, Officer Hight did state in his affidavit that

28   "Briggs advised that photograph #2 was also a close resemblance of the suspect."  Tran Decl., Ex.

1    J (Prob. Cause Aff. at 3).

2         The most problematic evidence for the City Defendants consists of the misrepresentations

3    that Officer Hight made about Ms. Briggs's reaction to Mr. Collins's photo in the second lineup.

4    But even here the Court ultimately concludes that the misrepresentations were not material (and/or

5    that no reasonable jury could find materiality).  If the state court judge had seen the actual video of

6    Ms. Briggs's reaction to Mr. Collins's photo, the judge would have seen that Ms. Briggs did have

7    a response of some kind – *e.g.*, even if she did not grab Mr. Collins's photo, she specifically asked

8    to see his photo and picked it up to review.  More important, Ms. Briggs ultimately did not pick

9    the fifth photo, the photo she was looking at when she began to openly cry; rather, she picked Mr.

10   Collins's instead (which had immediately preceded the fifth photo).  Although Ms. Briggs

11   indicated that the features of the man in the fifth photo were similar to those of the shooter, she

12   rejected that man as being the shooter and focused on the second and fourth photos instead – even

13   if neither of those photos had evoked an extreme emotional response.[17]

14        Based on the corrected information above and the unchallenged information presented to

15   the state court judge, there was a substantial basis for a finding of probable cause.  Notably, the

16   same day of the shooting, Ms. Briggs implicated her john as the assailant.  Ms. Briggs had a

17   factual basis for believing that the john was the shooter, *i.e.*, because his car and the car that the

18   shooter driving appeared to be the same.  Ms. Briggs' claim that the john's car and the shooter's

19   car were one and the same was substantiated: she noted that the john's car had a Lyft sticker, and

20   the video surveillance also showed a car with such a sticker.  In addition, at least one person called

21   911 claiming she had seen the shooting, describing the same kind of car as Ms. Briggs had, and

22   providing the license plate number for the car she believed was involved; that license plate number

23   matched the number that Ms. Briggs was given from other prostitutes.  The car with the license

24   plate number was a Hertz car and notably was part of its Lyft program.  That car had been rented

25   out to Mr. Collins, who matched the description of the john provided by Ms. Briggs (e.g., an older

26

27   [17] The Court acknowledges the City Defendants' position that it was Mr. Collins's photo that
     precipitated an emotional response and that the emotional response only became apparent while
28   Ms. Briggs was viewing the fifth photo.

1   black man and bald).  And Ms. Briggs, though not without some uncertainty, ultimately chose Mr.

2   Collins in the second lineup.  Finally, criminal records indicated that Mr. Collins had previously

3   been a suspect in a sexual assault, and a firearms check revealed that he possessed three guns.

　　　　　　　　b.　　Testimony at Preliminary Hearing

5   　　　Mr. Collins has suggested that, even if the misrepresentations/omissions in the probable

6   cause affidavit were not material, he still has a judicial deception claim because Officer Hight also

7   made misrepresentations/omissions to the state court judge who presided over the preliminary

8   hearing in the criminal proceedings.  But as above, materiality is an obstacle that Mr. Collins

9   cannot overcome.

10   　　　There is no dispute that, at the preliminary hearing, the judge was presented with more

11   evidence than that presented to the state court judge at the time of the *Ramey* warrant.  There is

12   also no dispute that some of this evidence was favorable to Mr. Collins – *e.g.*, Ms. Briggs first

13   claiming that someone with dreads was the shooter, the full results of the first photo lineup, how

14   the photo for the second lineup was obtained, the possible suggestiveness of the second photo

15   lineup, the full results of the second photo lineup, and so forth.  Implicitly recognizing the

16   qualitative difference in the evidence presented at the preliminary hearing, Mr. Collins has in his

17   papers presented a limited list of what "lies" were told at the preliminary hearing,[18] *i.e.*:

18   　　　　• Officer Hight claimed that two people had called 911 and supplied a license plate

19   　　　　　number when in fact there was just one.

20   　　　　• Officer Hight testified that Ms. Briggs gave him the license plate number (supplied

21   　　　　　by other prostitutes she knew), *see* Tran Decl., Ex. L (Tr. at 69), when in fact she

22   　　　　　gave the number to a different officer (Officer Garcia).

23   　　　　• Officer Hight claimed that, during the second photo lineup, Ms. Briggs had an

24   　　　　　emotional response when presented with Mr. Collins's photo; however, the video

25   　　　　　recording of the lineup shows an emotional response in reaction to the photo that

26

27   [18] At the hearing on the summary judgment motion, Mr. Collins also referred to
     misrepresentations made by Ms. Briggs at the preliminary hearing.  However, Officer Hight
28   cannot be held accountable for misrepresentations that Ms. Briggs made.

followed Mr. Collins's.

- Officer Hight testified that, with respect to the second photo lineup, Ms. Briggs indicated that one other person appeared similar to the shooter (the man in the second photo) when in fact she had made comments about an additional two photos (the fifth and sixth photos).

*See* Opp'n at 13.[19]

Similar to above, there is still a substantial a basis for a finding of probable cause even if Officer's Hight's false testimony at the preliminary hearing were "corrected."  For example:

- Even if there was just one person (not two) who called 911 and provided a license plate number, that number was nevertheless still provided; furthermore, the number given by the 911 caller matched the license plate number that Ms. Briggs was given by other prostitutes.

- Even if it was Officer Garcia (and not Officer Hight) who spoke with Ms. Briggs about the license plate number, that does not change the fact that Ms. Briggs was given the license plate information by other prostitutes – and that this number matched the number given by the 911 caller.  And the car with the identified license plate had a Lyft sticker, something Ms. Briggs had identified for her john's car even before the license plate number had been provided.

- Even if Ms. Briggs did not have an "extremely emotional response by looking at Mr. Collins' photograph," Cabral Bonner Decl., Ex. 28 (Tr. at 81); *see also* Cabral Bonner Decl., Ex. 28 (Tr. at 83) (Officer Hight testifying that "[h]er emotional response was indicated [sic] that that was the photograph that she was comfortable with"), Ms. Briggs still ended up selecting Mr. Collins as the assailant, as discussed

---

[19] Mr. Collins has also suggested that Officer Hight lied at the preliminary hearing about getting the approval of the D.A.'s Office for the second lineup – *i.e.*, "to convince the [state] court [judge] that the second lineup was constitutional."  Opp'n at 23.  This somewhat odd given that Mr. Collins is also arguing that Officer Hight and Ms. Dooher conspired together to falsely arrest and imprison him.  But even if Officer Hight made this misrepresentation at the preliminary hearing, that would effectively be immaterial because the D.A.'s Office is not controlling authority on whether the lineup was legally permissible.  That was up to the state court judge to decide.

1    above.[20]

2    • Even if Officer Hight did not on his own mention the comments Ms. Briggs had

3       made about the fifth and sixth photos, Mr. Collins's attorney still questioned

4       Officer Hight about the sixth photo. *See* Tran Decl., Ex. L (Tr. at 85-87).

5       Furthermore, the second photo lineup was admitted as evidence for the judge to

6       consider, and thus the judge could see that Ms. Briggs had noted the similarities

7       between the assailant and three other subjects.[21]  *See* Tran Decl., Ex. L (Tr. at 32)

8       (referring to Exhibit B).

9        Perhaps recognizing the weakness in his case, Mr. Collins argued at the summary

10   judgment hearing that there was another misrepresentation that Officer Hight made at the

11   preliminary hearing: to wit, that Officer Hight saw the video recording of the second photo lineup

12   and that, on the video, he saw Ms. Briggs select Mr. Collins's photo.  *See, e.g.*, Cabral Bonner

13   Decl., Ex. 28 (Tr. at 83) (Officer Hight testifying that Ms. Briggs "said that there was another

14   photograph in that same array who had other similar descriptions, but ultimately she also indicated

15   – well, she reverted back to Photograph Number 4 as the photograph of the suspect"; after the

16   judge asked, "So you are basing that on the video you watched," testifying: "Yes, Your Honor[]

17   [a]nd after talking with her, she felt the most comfortable with the pick that she made").  In fact,

18   the video recording did not show Ms. Briggs selecting Mr. Collins's photo – whether one time or

19   two times (*i.e.*, "reverting" back to the photo) because the video did not capture the entirety of the

20   transaction.  *See* Reply at 9 (admitting that the video "abruptly ends at some point during the

21   _____

22   [20] At the preliminary hearing, Officer Hight did not give details about what Ms. Briggs's alleged
     emotional response was.  This stands in contrast to Officer Hight's statement in his probable cause

23   affidavit where he gave specifics about what her purported response was.  There is no indication
     that Officer Hight's probable cause affidavit was ever shown to the state court judge who presided

24   over the preliminary hearing.

25   [21] It appears that the evidence admitted at the preliminary hearing included the following: (1)
     Exhibit A, the initial written statement of Ms. Briggs that Officer Breznik prepared, *see* Tran

26   Decl., Ex. L (Tr. at 22); (2) Exhibit C, the first photo lineup, *see* Tran Decl., Ex. L (Tr. at 26); (3)
     Exhibit B, the second photo lineup, *see* Tran Decl., Ex. L (Tr. at 32); (4) Exhibit 1, a photo of Ms.

27   Briggs at the hospital, *see* Tran Decl., Ex. L (Tr. at 55); (5) Exhibit 2, a photo of the gunshot
     wound, *see* Tran Decl., Ex. L (Tr. at 56); (6) Exhibit 4, a picture of the Hyundai, *see* Tran Decl.,

28   Ex. L (Tr. at 65); and (7) Exhibit 3, the handgun that was found during the search.  *See* Tran Decl.,
     Ex. L (Tr. at 66).

United States District Court
Northern District of California

1    photo lineup and before Briggs made her selection of Plaintiff's photo" but noting that, in his

2    deposition, Officer Ruiz "testified he did not voluntarily turn off the camera . . . and . . . was

3    'shocked'' to find out that the recording was not complete").  This argument, however, fares no

4    better than the others made by Mr. Collins, once again because of materiality.  Even if Officer

5    Hight misled the judge at the preliminary hearing in a purposeful effort to enhance the credibility

6    of Ms. Brigg's selection, that misrepresentation was not material because, at the end of the day,

7    Ms. Briggs did select Mr. Collins's photo as reflected in the written statement that Ms. Briggs

8    signed at the end of the lineup.  *See* Cabral Bonner Decl., Ex. 18 (second photo lineup).  The effect

9    of Officer Hight's "enhancement" of the facts was incremental.

10         Accordingly, the Court concludes there is no genuine dispute that any

11   misrepresentations/omissions made by Officer Hight were not sufficiently material to vitiate the

12   state court judge's finding of probable cause.

13         c.    Summary

14         For the reasons stated above, though Officer Hight appears to have engaged in

15   unprofessional conduct, he is entitled to summary judgment on Mr. Collins's claim for false

16   arrest/imprisonment based on judicial deception, whether based on federal or state law, because

17   his misrepresentations and omissions to the state court were not, under applicable law, material.[22]

18

19

20

21   [22] Mr. Collins does not argue that California state law differs from federal law in assessing the
     existence of probable cause after correcting for the inaccuracies of an officer's affidavit or
22   testimony.  The "substantial basis" for probable cause language in *Chism* appears rooted in, *e.g.*,
     *Illinois v. Gates*, 462 U.S. 213, 236 (1983) (stating that "the traditional standard for review of an
23   issuing magistrate's probable-cause determination has been that so long as the magistrate had a
     'substantial basis for . . . [concluding]' that a search would uncover evidence of wrongdoing, the
24   Fourth Amendment requires no more"); *id.* at 238-39 (noting that "the duty of a reviewing court is
     simply to ensure that the magistrate had a 'substantial basis for . . . [concluding]' that probable
25   cause existed").  California courts appear to follow *Gates*.  *See, e.g.*, *People v. Costello*, 204 Cal.
     App. 3d 431, 444 (1988) ("We start with the fundamentals applicable to warrants generally.  'The
26   task of the issuing magistrate is simply to make a practical, common-sense decision whether,
     given all the circumstances set forth in the affidavit before him, including the "veracity" and
27   "basis of knowledge" of persons supplying hearsay information, there is a fair probability' of
     criminal activity.  (*Illinois v. Gates* (1983) 462 U.S. 213, 238.)  The duty of a reviewing court 'is
28   simply to ensure that the magistrate had a "substantial basis for . . . [concluding]" that probable
     cause existed.'").

United States District Court
Northern District of California

United States District Court
Northern District of California

2.   <u>Garden-Variety Claim for False Arrest/Imprisonment and Claim for Malicious Prosecution</u>

In addition to the false arrest/imprisonment claim based on judicial deception, Mr. Collins also has a garden-variety claim for false arrest/imprisonment, as well as a claim for malicious prosecution. For both of the latter claims, probable cause is an essential element. *See, e.g.*, *Yousefian v. City of Glendale*, 779 F.3d 1010, 1014 (9th Cir. 2015) (stating that "[t]he absence of probable cause is a necessary element of § 1983 false arrest and malicious prosecution claims"). For reasons similar to those stated above, the Court concludes that no reasonable jury could find a lack of probable cause, *see McKenzie v. Lamb*, 738 F.2d 1005, 1007-08 (9th Cir. 1984) (noting that for a § 1983 case, probable cause is usually a question for a jury and "summary judgment is appropriate only if no reasonable jury could find that the officers did or did not have probable cause to arrest"), which simply requires that there be a fair probability that Mr. Collins had committed a crime. Although there was some evidence that weighed in Mr. Collins's favor, that evidence was counterbalanced by other evidence as described above. The Court also notes that, for the § 1983 claims, qualified immunity also applies because, at the very least, probable cause presents a close call. *See Zayas v. Ortega*, No. 17-cv-02739-EMC, 2018 U.S. Dist. LEXIS 241393, at *26 (N.D. Cal. Aug. 10, 2018) (noting that, "if probable cause were a close call, Defendants would at least be protected by qualified immunity"); *Sterlin v. City of N.Y.*, 2014 U.S. Dist. LEXIS 77537, at *10-11 (S.D.N.Y. June 5, 2014) (noting that qualified immunity applies where there is "'arguably probable cause'"; "it protects officers from personal liability where, although the officer made the wrong call, he was making a close call and he acted reasonably under the circumstances").

B.   <u>Officer Gatdula</u>

Officer Gatdula was the officer who executed the wall-off traffic stop requested by Officer Hight. Mr. Collins argues that, because the wall-off stop was improper, Officer Gatdula can be held liable (both under federal and state law).

As an initial matter, the Court notes that, based on the allegations in the operative complaint, Mr. Collins seemed to claim that Officer Gatdula could be held liable for not only the

improper wall-off stop but also for the false arrest/imprisonment of Mr. Collins – presumably, because the photo that Officer Gatdula obtained was later used in the second photo lineup.  In his opposition brief, however, Mr. Collins no longer seems to put forth any false arrest/imprisonment claim as to Officer Gatdula – at least not clearly.  Even if he had, summary judgment would be proper as to that claim because Officer Gatdula otherwise played no role in the investigation of Mr. Collins, and Officer Hight's actions after getting the photo from Officer Gatdula would be a superseding action breaking the chain of causation between Officer Gatdula's actions and Mr. Collins's injury.  *See Galen v. Cty. of L.A.*, 477 F.3d 652, 663 (9th Cir. 2007) (noting that "traditional tort law principles of causation . . . apply to § 1983 claims"); *In re CIM-SQ Transfer Cases*, No. 22-mc-80066-WHO, 2022 U.S. Dist. LEXIS 129763, at *22 (N.D. Cal. July 21, 2022) (noting that traditional tort principles such as intervening cause apply in § 1983 cases); *Tolentino v. City of Yonkers*, No. 15 CV 5894 (VB), 2017 U.S. Dist. LEXIS 162392, at *14-15 (S.D.N.Y. Oct. 2, 2017) (noting that, in a § 1983 action, "[i]t is not enough to show a plaintiff's injury would not have occurred 'but for' a defendant's actions" and instead a "[c]ourt must consider the 'foreseeability or the scope of the risk created by the predicate conduct' and whether there was 'some direct relation between the injury asserted and the injurious conduct alleged'"; "'[g]enerally, an intervening intentional or criminal act is a type of superseding cause that severs the liability of the original tort-feasor'").

The Court acknowledges Mr. Collins's assertion that there was a conspiracy among Defendants; however, there is no evidence to support a conspiracy involving Officer Gatdula.  The mere fact that Officer Hight solicited police assistance with getting a photo of Mr. Collins and that Officer Gatdula was the one who took the photo is not enough to give rise to a genuine dispute regarding the existence of a conspiracy.  There needs to be more specific evidence suggesting an agreement which comprise the alleged conspiracy.  *Cf. Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (in the 12(b)(6) context, noting that, for an antitrust claim of unlawful agreement to restrain trade, there must be "allegations plausibly suggesting (not merely consistent with) agreement").

Officer Gatdula, of course, could still be liable if the wall-off stop were an unreasonable

United States District Court
Northern District of California

1    seizure (a theory independent of false arrest).  Here, Mr. Collins seems to have two theories: (1)

2    there was not reasonable suspicion nor probable cause to support the traffic stop; and (2) even if

3    there were reasonable suspicion or probable cause for the traffic stop at the outset, Officer Gatdula

4    unduly prolonged the stop.  The analysis of Mr. Collins's claims against Officer Gatdula is more

5    complicated than might appear at first blush.

6              On (1), Mr. Collins has raised a question of fact as to whether Officer Gatdula was entitled

7    to stop him for a traffic violation (*i.e.*, not stopping at the limit line or not using a turn signal).

8    Mr. Collins has submitted a declaration disputing that he committed a traffic violation and this is

9    not a sham declaration given that, at the scene, when he was stopped by Officer Gatdula, he stated

10   that he thought he had come to a stop and used his signal.  *See* Cabral Bonner Decl., Ex. 15

11   (video).

12             Implicitly recognizing that this is a problem (at the summary judgment phase at least), the

13   City Defendants argue that Officer Gatdula was *also* entitled to stop Mr. Collins because there was

14   reasonable suspicion that he was the assailant in Ms. Briggs's case – even if the officer did not tell

15   Mr. Collins that this was part of the reason why he had been stopped.  The City Defendants

16   acknowledge that, at the time of the stop, about a week had passed since the shooting; however,

17   they argue that the police are still entitled to do a stop to investigate a completed felony, *i.e.*, a

18   crime need not be ongoing or just have been completed in order to conduct a stop.  The City

19   Defendants have support for this position.  In *United States v. Hensley*, 469 U.S. 221 (1985), the

20   Supreme Court held that, "if police have a reasonable suspicion, grounded in specific and

21   articulable facts, that a person they encounter was involved in or is wanted in connection with a

22   *completed* felony, then a *Terry* stop may be made to investigate that suspicion."  *Id.* at 229

23   (emphasis added); *see also United States v. Grigg*, 498 F.3d 1070, 1077 (9th Cir. 2007) (noting

24   that the "potential threat of violence created the exigency in *Hensley* to stop the suspect that

25   justified foregoing the Fourth Amendment's warrant requirement").  The Supreme Court also

26   stated in *Hensley*: "[I]f a flyer or bulletin has been issued on the basis of articulable facts

27   supporting a reasonable suspicion that the wanted person has committed an offense, then reliance

28   on that flyer or bulletin justifies a stop to check identification, to pose questions to the person, or

40

to detain the person briefly while attempting to obtain further information." *Hensley*, 469 U.S. at 232; *see also United States v. Ramirez*, 473 F.3d 1026, 1036-37 (9th Cir. 2007) (noting that, "in some of our prior cases the investigating officer suggested why the defendant should be seized, but at no time have we suggested that the conveyance of such information was affirmatively required"; "[w]e are satisfied that the collective knowledge doctrine includes no requirement regarding the *content* of the communication that one officer must make to another") (emphasis in original); *cf. Torres v. City of L.A.*, 548 F.3d 1197, 1212 (9th Cir. 2008) (stating that, "'where an officer has an objectively reasonable, good-faith belief that he is acting pursuant to proper authority, he cannot be held liable if the information supplied by other officers turns out to be erroneous'[;] '[t]he lynchpin is whether the officer's reliance on the information was objectively reasonable'").

Based on *Hensley*, the City Defendants have a nonfrivolous argument that Officer Gatdula was entitled to stop Mr. Collins independent of any traffic violation. The Court, however, need not dispositively rule on the merits of the argument because, at the very least, *Hensley* is a basis for Officer Gatdula to claim the benefit of qualified immunity. In other words, given the holding in *Hensley*, not every reasonable official would have concluded that there was a constitutional violation when Officer Gatdula stopped Mr. Collins independent of a traffic violation if there was reasonable suspicion that Mr. Collins was responsible for the shooting. To the extent Mr. Collins suggests that Officer Gatdula did not have even a reasonable suspicion to stop him for the shooting of Ms. Briggs (a standard less than probable cause), the Court does not agree as indicated in its analysis above on probable cause.

*Hensley* affects Mr. Collins's second theory of liability as well – *i.e.*, that Officer Gatdula improperly prolonged the traffic stop. Mr. Collins implicitly acknowledges that in *Arizona v. Johnson*, the Supreme Court stated that (1) "[a] lawful roadside stop begins when a vehicle is pulled over for investigation of a traffic violation" and (2) "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure so long as those inquiries do not measurably extend the duration of the stop." *Arizona v. Johnson*, 555 U.S. at 333; *see also Rodriguez*, 575 U.S. at 354 (stating that an

1    officer "may conduct certain unrelated checks during an otherwise lawful traffic stop," but "he

2    may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily

3    demanded to justify detaining an individual").  Mr. Collins's position is that, in his case, the basis

4    for the traffic stop ended once the warrant check was done; at that point, Officer Gatdula either

5    should have cited him for the traffic violation or given him a warning.  (Officer Gatdula ultimately

6    did the latter.)  However, Officer Gatdula *waited* to make that decision – even though he *could*

7    have made it – to first make up the story about needing a photo of Mr. Collins because the DMV

8    picture was outdated.  Mr. Collins does not dispute that the prolonging of the stop was not lengthy:

9    it took about 30 seconds for Officer Gatdula to tell his story and then take the picture, but he

10    argues that this nevertheless constituted a violation of the Fourth Amendment.

11          Mr. Collins's position is not without merit.  *United States v. Milton*, No. 22-CR-93 (JMF),

12    2022 U.S. Dist. LEXIS 144542 (S.D.N.Y. Aug. 12, 2022), is an instructive case.  There, the

13    district court held as follows:

14          In light of *Rodriguez* and *Gomez* [the latter a Second Circuit
          decision], the Court is compelled to grant Milton's motion to
15          suppress.  As in *Gomez*, the overall stop in this case was only about
          five or six minutes.  But as in *Gomez*, the officers' "investigative
16          inquiries unrelated to the traffic violations 'prolong[ed] – i.e.,
          add[ed] time to – the stop.'"  As discussed above, by no later than
17          the 4:30 mark on Officer Burgos's body camera footage, the officers
          had completed their checks of both the driver and Milton and
18          confirmed that there were no outstanding warrants for either.  At
          that point, all of the "ordinary inquiries incident to the traffic stop"
19          had been completed, and the only tasks left for the officers to
          perform were issuing a summons, ticket, or warning for the motor
20          vehicle violations and letting Milton and the driver go.  Yet the
          officers did not do either.  (Indeed, as in *Gomez*, they never issued a
21          summons, ticket, or warning.)  Instead, their "questioning
          'detour[ed] from th[e] mission' of the stop" – the Car's excessive
22          window tinting, the driver's failure to signal when changing lanes,
          and Milton's failure to wear a seatbelt – to other subjects, including
23          the driver's criminal history, whether there were any fraudulent
          identifications or weapons in the Car, and whether the driver would
24          consent to a search of the Car.  These undisputed facts demonstrate
          beyond any doubt that "the officers prolonged the seizure by asking
25          [the driver and Milton] . . . questions not pertinent to the [motor
          vehicle] violations."  Under *Rodriguez* and *Gomez*, this act of
26          prolonging the seizure violated the Fourth Amendment – even
          though the resulting delay was just a matter of minutes.

27

28    *Id.* at *19-21.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  The problem for Mr. Collins is – once again – *Hensley*.  Based on *Hensley*, Officer Gatdula

2  has qualified immunity because he had reasonable suspicion to stop Mr. Collins for the shooting

3  of Ms. Briggs, and a reasonable officer could have concluded that the stop was not "measurably"

4  being prolonged since taking a picture of Mr. Collins was related to the nature of the stop and only

5  added seconds to the length of the stop.  No Supreme Court or Ninth Circuit precedent establishes

6  such circumstances violates the Constitution.

7  Officer Gatdula therefore has qualified immunity with respect to the § 1983 claims.

8  Although qualified immunity for purposes of § 1983 does not apply to the state law claims, the

9  state claims asserted against Officer Gatdula are not viable based on similar reasoning.  For

10  example, Officer Gatdula did not fraudulently stop Mr. Collins because, even if no traffic violation

11  had been committed, Officer Gatdula was also assisting in the investigation of the shooting of Ms.

12  Briggs, and Officer Gatdula was entitled to rely on Officer Hight's conclusion that there was

13  reasonable suspicion to believe Mr. Collins was involved in the shooting.

14  Accordingly, the federal and state law claims asserted against Officer Gatdula.

15  C.  <u>Officer Ruiz</u>

16  Officer Ruiz was involved in the underlying events because he was the officer who showed

17  Ms. Briggs the second photo lineup.  In his brief, Mr. Collins argues that Officer Ruiz

18  administered the lineup in an impermissible way – specifically, having Ms. Brigs go through the

19  lineup at least four times but likely more – in order to get her choice down to Mr. Collins.  *See*

20  Opp'n at 32-33; *see generally* TAC ¶ 164 *et seq.*  (According to Mr. Collins, it is not known

21  exactly how many times Ms. Briggs went through the lineup because the video recording of the

22  lineup cut out.  However, he contends that the video indicates three viewings with a fourth one

23  starting before the video cuts out.  He also asserts that it is likely that there were more viewings

24  after the fourth because the lineup appears to have continued for another 10 minutes before Ms.

25  Briggs selected his photo (at 12:12 p.m.) and then another 4 minutes before Ms. Briggs signed off

26  on the lineup on the first page (at 12:16 p.m.).  *See* Cabral Bonner Decl., Ex. 18 (second photo

27  lineup).)

28  Mr. Collins's federal and state claims against Officer Ruiz lack merit as they are entirely

speculative.  There is no indication that Officer Ruiz knew who the suspect (Mr. Collins) was.
The fact that Ms. Briggs got her choices down to the second photo and the fourth photo (Mr.
Collins) and then picked Mr. Collins does not, by itself, give rise to a reasonable inference that
Officer Ruiz knew who the suspect was at the time he conducted the lineup.

The federal and state claims against Officer Ruiz are therefore dismissed.

D.      Chief Kirkpatrick

Chief Kirkpatrick has been sued because she was the Chief of Police during the relevant
events related to Mr. Collins.  It is well established that, under § 1983, a supervisor "may not be
held liable for the unconstitutional conduct of [a] subordinate[] under a theory of respondeat
superior."  *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).  A supervisor can be held liable only for
his or her "own individual actions."  *Id.*  More specifically, "[a] defendant may be held liable as a
supervisor under § 1983 'if there exists either (1) his or her personal involvement in the
constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful
conduct and the constitutional violation.'"  *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011).

> "The requisite causal connection can be established . . . by setting in
> motion a series of acts by others," or by "knowingly refus[ing] to
> terminate a series of acts by others, which [the supervisor] knew or
> reasonably should have known would cause others to inflict a
> constitutional injury."  "A supervisor can be liable in his individual
> capacity for his own culpable action or inaction in the training,
> supervision, or control of his subordinates; for his acquiescence in
> the constitutional deprivation; or for conduct that showed a reckless
> or callous indifference to the rights of others."

*Id.* at 1207-08; *see also Moss v. United States Secret Serv.*, 675 F.3d 1213, 1231 (9th Cir. 2012).
Although this standard is applicable in § 1983 cases specifically, Mr. Collins has made no
argument that state law materially differs in assessing supervisory liability under state law.

Based on his papers, Mr. Collins's theory of liability with respect to Chief Kirkpatrick
seems to be based on an alleged failure to train.  Mr. Collins suggests that Chief Kirkpatrick failed
to train as to (1) how to conduct double-blind sequential photo lineups and (2) how to take case
notes.  There are several problems with Mr. Collins's claims against Chief Kirkpatrick.

First, he mischaracterizes Chief Kirkpatrick's deposition testimony.  She testified that she,
personally, did not train or implement training or that she had no memory of training, but that does

44

not mean that there was no training on those subjects.  *See, e.g.*, Charles Bonner Decl., Ex. I (Kirkpatrick Depo. at 24 (in response to the question,  "[D]id you implement, you personally implement any training on double-blind sequential line-ups?," stating, "I did not[;] I did not personally train"); Charles Bonner Decl., Ex. I (Kirkpatrick Depo. at 27) (testifying that she did not provide any direct training to detectives; adding that there was a training unit for detectives but she could not "speak to any of the actual details of that"); Bonner Decl., Ex. I (Kirkpatrick Depo. at 30) (stating that she did not have a memory of instructing anyone to develop training specifically on how to conduct double-blind sequential photo lineups); Bonner Decl., Ex. I (Kirkpatrick Depo. at 31) (stating that she did not know if there was a policy on case notes – *i.e.*, she had "no memory").

Second, with respect to lineups, there is no indication that a double-blind sequential lineup was not executed, either for the first or the second photo lineup.  For instance, Officer Hight did not conduct the lineups; rather, they were conducted by Officer Filice and Officer Ruiz, respectively.  There is no indication that either Officer Filice or Officer Ruiz knew who the suspect was in the lineup at issue.  The lineups have written instructions that are designed to guard against suggestiveness – *e.g.*, noting that "[t]he person who committed the crime may or may not be included," that "[y]ou should not feel you have to make an identification," and that "[i]t is just as important to exclude innocent persons as it is to identify the perpetrator."  Cabral Bonner Decl., Ex. 18 (second photo lineup).  There is also evidence that officers were trained on how to conduct lineups.  *See, e.g.*, Valle Depo. at 13-14, 32 (testing that there was a policy on photo lineups in place as of 2013 and that "all investigators that come up to CID [the criminal investigation department] should have been trained by their supervisors as well prior to conducting the photo lineups"); Cabral Bonner Decl., Ex. 76 (OPD Information Bulletin, dated July 2013, addressing double-blind sequential lineups; stating that "[t]his document is intended to layout some background information on DBSL to help move towards this new procedure," as supported by police chiefs and the DA in Alameda County).  Finally, it is worth noting that Mr. Collins's position is, in effect, that Officer Hight and/or Officer Ruiz *deliberately* designed or carried out a suggestive lineup so that Ms. Briggs would choose Mr. Collins as the shooter.  But that does not

suggest a failure to train but rather a flouting of training – *i.e.*, no matter how the officers were trained, they had purposefully decided to target Mr. Collins.  This would not be a basis for supervisory liability as to Chief Kirkpatrick.

Third, with respect to a failure to train regarding the taking of case notes, Mr. Collins seems to argue that Officer Hight failed to include exculpatory information in his case notes – *e.g.*, Ms. Briggs's initial description of the shooter as someone with dreads, her initial suggestion that Mr. Warren could be the shooter, etc.  But similar to above, Mr. Collins's position is that Officer Hight *deliberately* concealed information, which would suggest not a failure to train but rather a conscious decision to lie.  Again, this would not be a basis for supervisory liability.  And Mr. Collins has presented no evidence of lack of training on this point.

Accordingly, the Court grants Chief Kirkpatrick summary judgment on both the federal and state claims asserted against her.

E.     City

Finally, for the City, Mr. Collins has similarly claimed a failure to train as a basis for § 1983 liability.  (No state claims have been pled against the City.)  The analysis above on Chief Kirkpatrick is applicable here as well.  The § 1983 claims against the City are therefore dismissed.

## V.     CONCLUSION

For the foregoing reasons, the Court grants in part and defers in part Ms. Dooher's motion for summary judgment and grants the City Defendants' motion for summary judgment. Supplemental briefing on Ms. Dooher's motion should be filed in accordance with the above (*i.e.*, Ms. Dooher shall have three weeks from the date of this order to file her brief and Mr. Collins two weeks thereafter to file his brief).

This order disposes of Docket Nos. 82 and 83.

**IT IS SO ORDERED**.

Dated: October 13, 2022

_____
EDWARD M. CHEN
United States District Judge

United States District Court
Northern District of California